GENEVA E. McKINNEY, Defendant in Error, v. AMERICA HUTSON, ARTHUR BRYANT and CARRIE BRYANT, Plaintiffs in Error.—81 S. W. (2d) 951.

Division One, April 17, 1935.

*John H. Windsor* for plaintiff in error.

*Ira H. Lohman* and *H. P. Lauf* for defendant in error.

FERGUSON, C.—This suit is in two counts. By the first count plaintiff, claiming title thereto, prayed the court to find certain conveyances, purporting to pass title to 160 acres of land, situate in Cole County, from defendant Arthur Bryant and ultimately vesting same in his wife, defendant Carrie Bryant, to be fraudulent and void and to cancel and set same aside and vest the title to said land in plaintiff. By the second, an ejectment, count plaintiff sought to oust defendants Arthur and Carrie Bryant, husband and wife, from the possession of the land and recover damages for withholding the possession thereof from plaintiff. Defendants' answer to each count was a general denial. The cause was tried as an equity suit and the court found for plaintiff on both counts and entered a decree declaring the conveyances through and by which defendant Carrie Bryant derived her claim of title fraudulent and void, that title to the land was vested in plaintiff and that she was entitled to the possession thereof with damages in the sum of one dollar. The defendants have brought the case here for review by a writ of error duly issued out of this court.

An understanding of the issues directly involved in this suit requires a resume of the prior course of events. Defendant Arthur Bryant a single man, was engaged in farming. He owned two, eighty-acre farms (the land involved), on one of which he resided, near Centertown in Cole County. His widowed mother made her home with him. Plaintiff a single woman resided at the home of her parents on a nearby farm. She was a school teacher. Bryant "courted" plaintiff for seven years prior to December 1, 1918, on which date they entered into an agreement, "became engaged," to be married "within a reasonable time thereafter" but due to the objections and "persuasions" of his mother Bryant continuously delayed and postponed marriage. In 1926 the engagement, "by mutual agreement" was terminated but "about the first day of February, 1928, the engagement and agreement to marry was again entered into . . . by the terms of which each agreed to marry the other within a reasonable time thereafter." Though plaintiff was at all times willing to marry Bryant and at no time sought or occasioned any delay or postponement of the marriage he continued to make excuses, resort to evasions and "put her off from time to time" until February, 1929, when he informed her he did not intend to, and would not, marry her. On February 3, 1929, plaintiff gave birth to a child. Bryant acknowledged, and apparently at no time either denied or undertook to deny, that he was the father of plaintiff's child. He signed a statement to that effect endorsed upon, or attached to, the birth certificate filed by the attending physician. Though plaintiff, her father and her sister urged him to carry out his agreement and promise to marry plaintiff Bryant refused to do so. The inference

arises that as early as sometime in 1928 his affections had shifted to one Carrie Groom, whom he married June 2, 1930 (the defendant herein Carrie Bryant). December 22, 1928, was the last time prior to the birth of the child that Bryant called on plaintiff. A few days after the birth of the child plaintiff's sister and Dr. Leach, who attended plaintiff, went to Bryant's home. The sister testified that, on that occasion, Bryant said he could not marry plaintiff "as long as his mother lived" that if they "went to court" he had two farms (referring to the land here involved) and he would just as leave it go that way as any other way." Though he promised to come to see plaintiff he did not do so and on February 28, plaintiff's father and sister (Goldie) called at the Bryant home but he was not at home. Upon his return home later that day he wrote and dispatched the following letter to plaintiff.

"Dear Geneva: When I come back from town Ma told me that Goldie and your father was to see me. What did they want? I received your letter some few days ago. You asked me why I did not come to see you. Well we done wrong and that is where we sinned. I have always had great respect for your folks and I am so shamed and hate it so bad that I don't want to see anyone I know. . . . You should not have let this be known for you know all about your condition in one month afterwards. I am just like I always told you. I have my mother to take care of and I don't pretend to marry anyone as long as she lives. If you don't want that child take it to the orphans home. There is one consolation Centertown and Elston community is a mere fly speck on this universe and we don't have to live here all our lives. If we had no responsibilities I would be willing to leave here and never come back. But I have my old mother wholly dependent upon me, but I hope she outlives me. She may do it because I have stomach trouble the very worst kind. No more for this time, as ever Bud."

Plaintiff's father testified that sometime during February, shortly after the birth of the child, he talked with Bryant; that Bryant asked "what do you want me to do about it;" that he replied "marriage would be the best" and Bryant said "I'll never marry," whereupon he told Bryant if he did not "do what was right" he "was liable to be sued" and Bryant replied "I have got two farms I would just as soon see go that way." Sometime in March Bryant called on plaintiff at her father's home. Plaintiff says that he inquired "what I would take to settle;" that she told him if he would marry her she would give her promise to get a divorce and he "would not have to bother with me," but he refused to consider the proposal. Bryant seems to have dismissed and refused any further negotiations with plaintiff or her family. The latter part of February or first part of March, Bryant discussed the matter with his brother Emmett who was

called as a witness for plaintiff. Emmett testified that on that occasion Arthur referred to the two farms which he owned and proposed to put "everything over in my name" and "wanted me to take possession of the land" and "take possession of everything," but that he told Arthur it was "too late now." Emmett Bryant's wife, stated that sometime, she thinks about March, Arthur Bryant told her "he had a good notion to turn everything over to" her and her husband "and skin out." On April 6 (1929), plaintiff commenced a proceeding in the Circuit Court of Cole County to establish the paternity of the child born to her on February 3 (1929), wherein Arthur Bryant was named as the father. It seems an item, in a Jefferson City newspaper was the first information Bryant had of this proceeding. He thereupon under date of April 10, wrote and dispatched a letter to plaintiff in part as follows:

"Geneva: I saw in the Jeff. City papers where you have brought suit against me to determine the parentage of your child. Don't you think that is unnecessary. Has anyone denied the parentage? The best way to settle that is out of court just you and I by our legal representatives. Court proceedings are very expensive and the lawyers gets most of the money. I would rather my money would go to the child instead of the lawyers pockets. I am old and not able to work like I used to work and if I have to pay out all I have for lawyers and court costs, I won't have anything for the child or my poor old mother who is an invalid and wholly dependent upon me. It seems to me like you and I ought to be intelligent enough and honest enough to settle between ourselves without all this gossip and publicity. To go to law is the very worst things for both of us. . . . If you say so, I'll come down to your house whenever it would suit you and I'll do my best to settle our trouble. . . . Let me hear from you at your earliest convenience. The roads are so bad that I don't believe I could get out with a car but if it is alright with you I'll come as soon as the roads will permit. I may come some night if ma isn't too bad.

"Write me and let me know.

"Sincerely Bud."

However, Bryant did not thereafter undertake or attempt to privately and personally discuss or negotiate with plaintiff with a view to a settlement of her claims against him as proposed in his letter, but on the day following, April 11, on his way to Jefferson City he stopped at plaintiff's father's home, where she resided, long enough to tell plaintiff's father that "they were trying to get" his property but "you can't get it, I am putting everything out of my hands today." Continuing to Jefferson City he there filed for record (July 11, 1929) a general warranty deed bearing date of April 2, 1928, and purporting to have been executed and acknowledged as of that

date before F. M. Harmon a justice of peace of Marion Township, Cole County. Bryant as grantor, in the deed, conveyed his two 80-acre farms (160 acres), the land involved herein, to his mother, Elizabeth Bryant as grantee. On April 20 (1929), plaintiff commenced an action against Bryant, in the Circuit Court of Cole County, for damages for breach of promise, or contract, to marry. At the trial of that action, in March, 1930, plaintiff had verdict and judgment against Bryant for damages in the sum of $6000. Thereafter upon an execution issued on said judgment the sheriff levied on the two 80-acre farms, 160 acres, as the property of Bryant, and the land was sold on August 9, 1930, at an execution sale at which plaintiff's bid of $1800 was the highest and thereupon a sheriff's deed conveying all of said land to plaintiff was duly executed and placed of record. The judgment was duly credited with the proceeds of said sale and thereafter on December 2, 1930, another execution was issued on the judgment on which the sheriff made a return *nulla bona.* As we have noted, plaintiff commenced the paternity proceeding April 6 (1929) ; Bryant filed his deed to his mother for record April 11 (1929) ; plaintiff commenced her action against Bryant for damages April 20 (1929). Shortly thereafter Bryant alone, called on a Jefferson City attorney, told him that his mother was ill and unable to come to Jefferson City, that she wanted a will prepared and had "told him how she wanted it." At Bryant's direction the attorney wrote a will whereby Bryant's mother as testator therein bequeathed the sum one dollar to each of her four children, devised and bequeathed all other property of every kind to (defendant) America Hutson, her sister-in-law, and named Arthur Bryant as executor without bond. The attorney left the date blank and instructed Bryant as to the proper formalities to be observed in the execution of the instrument. The will when filed for probate upon the death of his mother bore date of May 15, 1929. Though Elizabeth Bryant had four children living, each named in the will with a bequest of one dollar, this will, passes any and all of her own blood and makes a seemingly unnatural disposition of the property by devising it to a sister-in-law. We will note here that during all the time mentioned Bryant and his mother made their home on one of the farms, that he had the possession and the absolute control and management of both farms and all the business done and carried on in connection therewith and he testified to some kind of an oral and private agreement had at the time the will was executed, as supplementary thereof, to the effect that in the event of his mother's death he was to continue in possession of the land and have the entire charge, control, management and income thereof, that is, that he was "to have this property and go on living there as he had" been doing "for years and years." It is clear that he had such an understanding with his

mother and presumably with his aunt, the defendant America Hutson, the beneficiary named in the will. Any way it is apparent, and the conclusion irresistible, from Mrs. Hutson's own testimony and the circumstances of her connection with the matter that upon the death of Elizabeth Bryant (plaintiff's mother) Mrs. Hutson did not assert any claim to the land, that she never went into possession or had any thought of doing so and did not consider the devise as for her benefit and that she was a mere pawn which Bryant used in furthering a scheme or design to have the record title to his land shown as in another while he at all times retained the beneficial ownership and the actual possession, control and income thereof. Plaintiff's mother died December 27, 1929, and Mrs. Hutson says that "right after Mrs. Bryant's death," the exact date she does not undertake to fix, she went with Bryant to the office of Bryant's attorney, a Mr. Gill, at California, Missouri, and there "signed a deed" conveying this land to Arthur Bryant. Gill, Bryant's attorney, prepared the instrument at Bryant's request; no consideration passed and Mrs. Hutson merely signed it at the direction of Bryant and left it in possession of either Bryant or Gill. The deed was not placed of record. While Mrs. Hutson was positive in her statement that she "made a deed to this property to" Bryant he says that the instrument she signed on that occasion was a will and that he "had her will" the land herein involved to him. Attorney Gill represented Bryant in the trial of this case in the court below, other counsel appears here, but he did not advise the court whether the instrument he prepared on this occasion, at Bryant's request and direction, and which Mrs. Hutson, at Bryant's dictation signed, was a deed conveying the land to Bryant, as Mrs. Hutson thought and understood, or a will devising the land to Bryant, as he says. On June 2, 1930, after judgment (March 28, 1930) against him in the breach of promise suit Bryant was married to Carrie Groom. The sheriff's sale of this land, and deed to plaintiff, was made August 9, 1930. On August 28, 1930, Bryant caused his aunt, Mrs. Hutson to execute a quitclaim deed conveying this land to his wife, Carrie Bryant. No consideration passed. Mrs. Hutson merely did what Bryant directed. This deed was on the same day filed for record. Bryant's wife, the defendant Carrie Bryant, therefore claims title through the deed of Bryant to his mother, Elizabeth Bryant, the will of Elizabeth Bryant devising the land to America Hutson and the quitclaim deed of America Hutson to her. This, of course, ignores the testimony of America Hutson that prior thereto, "right after Mrs. Bryant's death," she had conveyed whatever interest, if any, she had by a deed to Bryant in which event any title or interest which she may have had was thereby, and at the time of the levy and sale under the execution, vested in Bryant. Plaintiff on the other hand contends, that

the deed from Bryant to his mother bearing date of April 2, 1928, which came to light and was placed of record April 11, 1929, was a fraudulent conveyance and null and void as to her; that Elizabeth Bryant took nothing thereby; that America Hutson could not take any better title under the will than her devisor had; that her deed to Carrie Bryant conveyed no title or interest whatsoever in this land; and that she therefore acquired title under and by virtue of the execution sale and the sheriff's deed. Though, as we have observed, Bryant was, at all the times mentioned, in the actual possession of this land exercising exclusive control and management thereof and carrying on the business of farming thereon and prior to, and until, April 11, 1929 (when he produced the deed to his mother and filed it for record) spoke and referred to it as his land, repeatedly stated that he owned the two farms and proposed the transfer of the property to his brother shortly after the child was born to plaintiff, he testified that on or about April 2, 1928, appearing as the date of the execution and acknowledgment of the deed to his mother, he made a bona fide sale and conveyance of the land to her; that he was desirous of selling the land; that his mother (who was, as he wrote plaintiff, wholly dependent upon him) offered to purchase the land; that the negotiations were carried on in the privacy of their home; that she offered to pay him $6000 for the land and all of his farming implements and live stock, except four head of cattle and one team of mules which he wished to reserve, on condition, however, that he continue to live there with her, manage the farms and see "that they were operated" just as he had done theretofore; that she paid him the entire sum of $6000, at their home, in "greenbacks," "fifty and twenty dollar bills;" that his mother was at the time eighty years of age; that none of this $6000 in currency was withdrawn from a bank but was money his mother had saved and "kept around the house;" that "something like half" of the $6000 was in $50 bills and "about half twenties;" that he put the $6000 in currency in two "bill folds," $3000 in each; that one room of the house was built of logs covered with "weather boarding" and he hid one of the billfolds, containing $3000 of the currency "between the weather boarding and the logs" but that the billfold and contents disappeared, was "misplaced," "lost or stolen" and he had never been able to find it. (He apparently accepted his loss with nonchalance not having reported it and apparently making disclosure thereof for the first time upon the trial of the breach of promise suit); and that he used all of the other $3000 "in paying living expenses, doctor's bills, hired help and necessary expenses" of operating the farms and it "drifted away like a snow bank before the sun." It was shown that the doctor's bills for his mother and himself paid, by him, since that date amounted to about $60. At the time of this case Bryant produced

the billfold in which he claims he placed the $3000 which he had spent, the other billfold containing the other $3000, which he said was "misplaced," "lost or stolen," was, he said, identical in size and in every respect. He said that in anticipation of the cross-examination he had come prepared to demonstrate that the billfolds would hold $3000 in currency in $50 and $20 bills and he proceeded to make the demonstration for the benefit of the court in this way. He had cut slips of paper, from a mail order catalogue, of a size corresponding to the size of bills. He then illustrated to the court that assuming the slips of paper were $20 bills the billfold was of ample capacity to hold $3000 in currency or assuming the paper slips to be $50 bills it would hold $7500. However, the demonstration does not appear to have impressed the court as being a corroborating or convincing circumstance of much weight. Plaintiff called the court reporter as a witness. He read from his notes of the cross-examination of Bryant in the breach of promise case and at that time Bryant said he divided the $6000 in currency in two equal parts, concealed "one package in the wall (of the home) behind the paper and the other I put in an old guitar box and it disappeared." Bryant further testified that his mother paid him the $6000 in $50 and $20 bills, some two or three days after the execution of the deed, in the daytime, at their home; that he then delivered the deed to her; that William Hunziker was present and witnessed the entire transaction; and that he does not know what his mother did with the deed but supposes "she kept it at the house among her papers." Hunziker was called as a witness by defendants. His testimony is vague and unsatisfactory and it is apparent it could have had but little weight with the trial court. He is a son-in-law of Bryant's wife, the defendant herein Carrie (Groom) Bryant. He said, that in April, 1928, he resided in Jefferson City; that one morning "in the fore part of April, 1928" he "went down to that neighborhood," where he formerly lived, and being acquainted with Bryant, stopped at the Bryant's home; that on that occasion he saw Elizabeth Bryant "transfer the money for the farm to Arthur Bryant;" that, "I don't know where she got the money from, when I first saw it she had it in her hands and she laid it on the table, it was a good pile of money but I never measured it . . . I never noticed the bills . . . and couldn't tell" the denomination of any of them; that Bryant "took the money and left the room" but "I didn't see any deed delivered." An excerpt from the testimony of Justice of the Peace Harmon (deceased at the time of this trial) given in the trial of the breach of promise suit was read. He stated the deed and acknowledgment was in his handwriting and that he "surely wouldn't make a mistake of a year (in the date) in making a deed." It will be remembered the deed of Bryant to his mother, and the acknowledg-

ment thereof, bore date of April 2, 1928. Under date of August 21, 1928, Bryant executed a mining lease on this land, as the owner thereof, wherein one J. W. Creech was lessee. This lease was prepared by and acknowledged, on August 21, 1928, before this same Justice of the Peace Harmon. In March, 1930, Bryant leased, or rented, a portion of the land to one Walter Jackson at a crop rental of "one-half of the corn and oats." Plaintiff also offered evidence that during the entire time involved Bryant carried a fire insurance policy on the farm buildings payable to himself as owner and that no change in, or transfer thereof, was ever requested or made.

Defendants, as plaintiffs in error, point out that this is an equity case to be considered *de novo* by us and claim generally that upon the facts and applicable law the trial chancellor erred in setting aside and canceling the deeds through and by which defendant Carrie Bryant claims title and in finding and decreeing title to be vested in plaintiff. While the case is here heard *de novo* and the weight of the evidence may properly be considered and passed upon nevertheless this court will usually defer to the findings of the chancellor, especially where, as in this case, there is conflicting oral testimony and the credibility of the witnesses who appeared before him is involved, except when convinced that his findings are clearly against the weight of the evidence. [Fessler v. Fessler, 332 Mo. 655, 60 S. W. (2d) 17; Manahan v. Manahan (Mo.), 52 S. W. (2d) 825; Scott v. Hill, 330 Mo. 490, 50 S. W. (2d) 110; Norton v. Norton (Mo.), 43 S. W. (2d) 1024; Pfotenhauer v. Ridgway, 307 Mo. 529, 271 S. W. 50.] Our discussion and review proceeds with this rule in mind.

The chancellor found Bryant's deed to his mother, bearing date of April 2, 1928, was without consideration and a wholly voluntary conveyance. That finding seems fully warranted in view of Bryant's incredible and inherently improbable story of a sale of the land to his mother and the trial chancellor's opportunity to observe the conduct and demeanor of the witnesses and weigh and pass upon, their credibility. Therefore in adopting the chancellor's finding on that issue we reject and disregard Bryant's claim of a bona fide sale of the land to his mother and treat the conveyance, at whatever time it may have been actually consummated, as voluntary.

But defendants say that the deed was executed and delivered in the early part of April, 1928, at a time when plaintiff was neither a creditor of, nor asserting any claim against, Bryant, and that it therefore cannot be treated as a fraudulent conveyance as to plaintiff. For the present we assume that the deed was executed and delivered at or about the date thereof, April 2, 1928. True Bryant had not at that time made any definite or final refusal to perform the contract to marry, as he later did, in February, 1929, nevertheless there is evidence tending to show, which considered in the light of subsequent

events warrants the inference, that he then contemplated that course and it may well be concluded that the animating purpose in making the voluntary conveyance to his mother, who necessarily lent herself to the scheme, was to put title to substantially all his property in her name with a view to thereby removing it- from jeopardy of, and securing it against, any claim or judgment against him that might arise out of, or result from, his contract of marriage, and relationship, with plaintiff; that is that the conveyance was conceived and made with the express fraudulent intent and purpose of defeating, preventing or hindering the collection or enforcement of any claim for damages that plaintiff might thereafter have growing out of his contemplated future breach of the contract to marry. At 27 Corpus Juris, page 521, it is said: "Where a conveyance is made with intent to defraud subsequent creditors.it may be assailed for fraud and set aside by them" (citing cases). However, it must appear, even in the case of a voluntary conveyance, that it "was made with an actual fraudulent intent" as to a subsequent creditor and "was participated in by both parties" thereto, and, if allowed to stand would result in injury to the creditor. [See 27 C. J., p. 555, and cases there cited.] Applying the last mentioned qualifications we are inclined to think the evidence warrants the finding that the conveyance was made in contemplation of and with an actual fraudulent intent to defeat any subsequent claim which plaintiff might establish against him and that his mother as grantee participated therein.

Again assuming that Bryant's deed to his mother was both executed and delivered on or about the date thereof the evidence, we think, justifies an inference, that the deed was a mere colorable transfer of title, a mere subterfuge; that the mother took and held the title pursuant, or subject, to a secret agreement or trust and that the same secret trust attached to the transfer of the property by devise to America Hutson; that by such secret arrangement the disposition and transfer of the title was at all times under the dominion and control of Bryant and while his mother first and then his aunt held title. as mere pawns which he moved about in his endeavor to circumvent and defeat the enforcement of any claim which plaintiff might make against him, he was, in fact, at all times, the real and beneficial owner of the property and a court of equity will so find and declare; therefore the execution sale reached and passed all the interest of Bryant in the land.

But accepting the execution of the deed as of the date it bears nevertheless the evidence permits the inference that no delivery thereof to the grantee was made until the filing for record with the resulting presumption of delivery as .of that date. The circumstances, and the appearances therefrom, indicate that though it be granted that Bryant did execute, and Harmon take the acknowledgment of,

the deed, on April 2, 1928, as it purports, that Bryant did not thereafter deliver it to the grantee named therein with intent to make it operative (Chambers v. Chambers, 227 Mo. 262, 127 S. W. 86), but retained it in his actual custody and possession with complete dominion over it until the date he produced it for filing with the purpose, as he stated at that time, of "putting everything out of my hands today." It will be recalled that after April 2, 1928, no change in the ownership of the land was evidenced or disclosed by the acts or conduct of the parties; that thereafter Bryant continued, as prior thereto, in the exclusive control, management and apparent ownership of the land; that about four months later Bryant, as the owner thereof, negotiated, executed and delivered a mining lease on the land; and that he held himself out as and repeatedly stated he was the owner of the land. Taking the delivery of the deed as of the date Bryant filed it for record, as it was a voluntary conveyance completed or consummated after the breach of the contract to marry and the accrual of plaintiff's cause of action, and in face of an impending and threatened action, against him, for damages, it was presumptively fraudulent as against plaintiff an existing creditor. Defendants not only did not rebut the presumption or inference thus arising but plaintiff not resting her case there adduced, and the whole evidence developed, facts and circumstances affirmatively showing an actual fraudulent intent on the part of Bryant, in the manipulation of the conveyance to his mother, and the subsequent attempted transfer of title, to hinder and defeat the enforcement of plaintiff's claim against him.

We have heretofore commented on the direct and positive testimony of Mrs. Hutson that very shortly after his mother's death Bryant prepared and, at his request and dictation, she signed and executed a deed conveying the land to him. Bryant said this instrument was a will whereby he "had her will" the land to him. Bryant's attorney prepared the instrument at his direction and it was signed and executed in the attorney's office and under his supervision but though present at the trial representing the defendants he did not enlighten the court on this controverted matter. The court may have well believed that, as she stated, Mrs. Hutson did, on that occasion, execute and deliver a deed to Bryant conveying all and any interest she had in the land to him in which event and accepting Bryant's version of the conveyance to his mother as a bona fide sale of the land to her for a consideration of $6000 the title Elizabeth Bryant thus acquired passed to and vested in Mrs. Hutson and was then conveyed to Bryant and was vested in him at the date of the rendition of the judgment and the levy and sale under execution.

The evidence shows a palpably fraudulent intent on the part of Bryant permeating and voiding the whole transaction and from

879

any angle the facts and circumstances are viewed the plaintiff is entitled to the relief prayed and the judgment of the trial court should be affirmed. It is so ordered. *Sturgis* and *Hyde*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.