Shirley WATSON, Administratrix of the
Estate of Hazel Howe, Deceased,
Respondent-Appellant,

v.

Sam HARRIS and Elsie Harris, Appellants-
Respondents, Defendants.

No. 53027.

Supreme Court of Missouri,
Division No. 2.

Dec. 31, 1968.

Farrington, Curtis & Strong, Thomas Strong, Springfield, for plaintiff-appellant.

Lincoln, Haseltine, Forehand & Springer, Edmund C. Forehand, Horace S. Haseltine, Carl E. Yates, Springfield, for appellants-respondents, defendants.

PRITCHARD, Commissioner.

Alva A. Caldwell on Sunday, January 17, 1965, killed Hazel Howe with a revolver, and then took his own life with a shotgun. By the verdict of a jury, plaintiff-administratrix was awarded $15,000 for Hazel's wrongful death against Sam Harris, executor of Alva's estate, under Count I of plaintiff's amended petition. The judgment on Count I has become final, that issue being tried first.

Less than forty-eight hours prior to the time that the bodies of Alva and Hazel were found, Alva had delivered deeds to all of his real property in Springfield, Missouri, to Sam and Elsie Harris (defendants herein), neither of whom was related to him. He did, however, consider them as close relatives and objects of his bounty. Count III of the petition sought to set aside these deeds upon the ground that they "were made for the purpose of defrauding present and subsequent creditors of Alva A. Caldwell." The court rendered judgment upon Count III and defendants appeal therefrom. This appeal presents the principal issue: Whether there was a sufficient evidence to support the finding that at the time Alva made the transfers of his property he had an actual, express fraudulent intent to defraud subsequent (then non-existing) creditors.

Also presented is plaintiff's cross-appeal from a judgment in favor of defendants for $2,609.15 on a pleading designated "set-off" for improvements made to the real property in question. There was also a judgment for $1,316.13 for rentals granted plaintiff under her later filed Count V, which defendants ask to be reversed along with the judgment upon Count III.

The trial court made findings of fact and conclusions of law which in substance and as to the principal issue follow: Hazel Howe left surviving adult heirs: Norma Howe, Bobby Glen Howe, and Shirley Watson, all her children, for whose benefit the action was brought. On May 20, 1966, "plaintiff obtained a jury verdict in the sum of $15,000.00 and costs against Sam Harris, as Executor of the Estate of Alva A. Caldwell, which verdict has become a Final Judgment, and which verdict arose out of the death of Hazel Howe, deceased, as a result of the tortious conduct of Alva A. Caldwell, deceased." Alva owned the three tracts of land in question. Elsie Harris is the stepdaughter of Alva and the wife of Sam Harris who is executor of Alva's estate. Sam and Elsie reside at 2232 Roanoke, Springfield, Missouri. On January 12, 1965, Alva executed three warranty deeds to his real estate to Sam and Elsie. On Friday, January 15, 1965, at approximately 4:00 or 4:30 p. m., Alva delivered the deeds to Elsie who accepted them and placed them in her home on her kitchen table. At approximately 6:00 p. m., Sam returned home from work, picked up the deeds from the kitchen table, inspected them, and put them back on the table. He then had some conversation with Elsie about the deeds, which were notarized, and the deeds were recorded on January 21, 1965.

The court further found that Alva, age 76, and Hazel, age 51, both single but both having been previously married, had been going together for several months, each disclosing some affection for the other. Around Christmas, 1964, the relationship between the two deteriorated. Alva destroyed a new watch he had given Hazel by beating it with a hammer. Hazel was afraid of him and called her son-in-law the morn-

ing of her death to come to her home as Alva was coming. Sometime prior to January 12, 1965, Alva formulated a plan to do a tortious act as to Hazel. As a part of the plan he executed the deeds to his real estate and delivered them to his stepdaughter. The deeds were voluntary and represented the bulk of his estate. He also executed his last will and testament, which disposed only of his personal property. Within forty-eight hours of the delivery of the deeds Alva consummated his plan by taking Hazel's life and then his own. The guns involved belonged to Alva, and the note (set out below) found at the scene was written by him and explains the missing details of the tragedy. It was found that the deeds were made by Alva to defendants with the fraudulent intent of depriving Hazel's heirs of their lawful claims arising out of the shooting. That intent is inferred from all the facts previously set forth as well as the following facts: "(a) No consideration was paid by defendants to Caldwell for the real property. (b) The transfer was of all of Alva Caldwell's real property excepting a cemetery lot. (c) After the conveyances Caldwell was without sufficient assets to pay the tortious debt to plaintiff. (d) The deeds were handed to Elsie Harris in haste and without explanation or discussion. (e) The deeds were not made in the usual course of business, but, rather, were made by Caldwell while defendants were not present." The points presented here substantially follow matters presented to the trial court from which conclusions of law were made, and judgment was entered setting aside the three deeds and adjudging them invalid and void as to plaintiff. A sale of the property was ordered to satisfy the wrongful death judgment and allowance of rentals to plaintiff and costs, with credit for the set-off judgment for defendants' improvements. The transcript reflects these facts:

During 1963 and 1964, Alva and Hazel had been going together, Hazel being the only lady Alva associated with for that approximate fourteen-month period. She treated him with kindness, was well mannered, pleasant and respectful toward him. She was never antagonistic toward him, and they displayed affection for each other. Alva told Elsie Harris, his stepdaughter, that he was very fond of Hazel. Hazel had sent Alva a birthday card, Easter card and a Christmas card, all indicating affection, the Easter card being signed "With love, Haz*le*." Hazel had given Alva a watch and a shaving kit for Christmas, 1964, which watch Alva showed to Sam Harris when Alva took Sam and Hazel to the airport for a flight to St. Louis. Alva gave Hazel a necklace watch as a gift for that Christmas.

Sometime after Christmas, 1964, the relation between Alva and Hazel became less cordial. As related by Hazel to her son-in-law, Earnest Watson, and testified to by him, "A. Yes, sir, she told me she was frightened of him. She showed me some things that he'd destroyed, Christmas presents. Q. Did she explain what he destroyed? A. A wrist watch and a necklace watch and an aerosol can of shaving cream." "She told me he suspected her of running around with someone else and that he come in and got the presents and said, 'Now, I want you to come with me, I want to show you what I'm goin' to do.' And she said he went in there and in that drawer and got a hammer and took 'em out there on that patio and she said, 'I wouldn't go watch him.' And she said he came back and it had shaving cream on it. He'd beat that compressor air can of shaving cream up, too. She had it all in a sack when she showed it to me." Hazel actually showed Earnest the wristwatch she had given Alva and which he had destroyed, and "It was undescribable." Hazel also told Earnest the following (to which the parties attach different significance on the italicized part): "She told me she'd tried to break off their relationship together, other than just bein' friends, and he didn't want to, and she'd asked him not to see her any more. *And he made the statement, or she did to me,* that 'If I can't have you, I'll see

no one else can.' " The last time that Earnest spoke with Hazel was about 9:15 a. m. on January 17, 1964, the day of the shooting. She called him at his home and asked if they would come down and he told her he would. "She asked us what we was going to do and I told her nothing special, and she said, 'Will you come down?' She said Alva was going to come down. She said, 'I'm scared of him. I told him not to come, but he said he's goin' to come anyhow. I told him I wouldn't be home.' She said, 'I want you' uns to come down.' " Earnest told her it would be one o'clock, after they got out of church, before they could get there.

Mr. and Mrs. Troy Burgess, who had lived next door to Alva for many years, saw Alva for the last time about 9:30 a. m., Sunday, January 17. Alva was then in his yard knocking ice out of the dog's drinking water and getting it some fresh water. The Burgesses honked and waved to Alva who smiled and waved back. Hazel was last seen alive by Mrs. Jenny Jenkins in church on January 17, and about 12:00 to 12:30 after church she saw her get into a light colored car within which was a man.

Earnest Watson, with his wife, Shirley, attended church on January 17, then went to Slagle (a small community near Bolivar, Missouri) where Hazel lived. They arrived at her home exactly at one o'clock. There was then no other car in Hazel's driveway when they pulled into it. Earnest got out and tried the front and back doors of the house and the garage, but all were shut and locked. He got back into his car and they drove back toward Bolivar to find Hazel. About 2½ miles from the house they met Alva driving along in a black Hudson. He was leaning up against the steering wheel and did not respond to Earnest's wave, but was looking straight down the road. The Watsons drove on into Bolivar and saw Hazel's car on the west side of the square, then they drove on to Earnest's grandmother's place. On returning about 3:30 to 4:00 p. m., they saw that Hazel's car was still on the square of Bolivar, and on arriving at Hazel's home found that people had gathered there.

About the middle of the afternoon of January 17, Stephen Butler, who worked for his father's funeral home in Bolivar, received a telephone call. A male voice said, "There's two bodies at Hazel Howe's house. Come and get them." Stephen asked who was calling, and the man said, "That doesn't make any difference." Stephen, along with John Smith, went to Hazel's residence and found a black Hudson automobile there. They tried the doors of the house and found them to be locked. They then went to a nearby grocery store and Stephen called the Howe residence asking if it were that residence. A man answered, "No, it isn't," and hung up. Smith called the same number and asked for Hazel and the man answered "Who?" and hung up. A third call was placed and when the phone was answered the person doing so refused to talk. At about 1:30 or 2:00 p. m., Butler and Smith contacted the sheriff, and deputy Flett arrived. They all tried to gain entry, but all doors were locked in Hazel's residence. The deputy and Smith then went to the rear of the house and saw through a window Alva's body slumped over. The back door was forced by them and inside the house they found Alva slumped over a shotgun, with a yardstick near. There was a wound in his chest at which the shotgun was pointed. His body was still warm. On a table in the room was the following note:

"Butler—notify Sam Harris, Springfield, phone TU 1–7372. 1 p. m., just killed Hazel. Tried to kill self, but gun snapped. Back to Bolivar and got shotgun in car. No [or Mr. (?)] Butler, get my body to St. John's as soon as possible so they can use my eyes. They are to eye bank."

Hazel's body was found face up on the bed, in a bedroom, dead from a revolver wound in her temple. In the living room a coffee table was displaced from its regular position, and a chair had been scooted

over. Her necklace had been broken, and a picture was either hanging crooked on the wall or was on the floor. Hazel had two fingernails torn almost off of her left hand; she was fully dressed and the heel of one shoe was caught in the bedspread. About 15 feet from Hazel's body a revolver was found, having in it two expended bullets and four unexpended ones with the imprint of a firing pin thereon. It was admitted that the revolver, the shotgun and the Hudson automobile belonged to Alva.

Prior to the foregoing events, Alva had on January 5, 1965, withdrawn $2,500 from his bank account, which was joint with Elsie Harris, leaving a balance of $128 therein. The check for this withdrawal was payable to "Self" and no trace of this money was ever discovered. On January 12, 1965, Alva made and acknowledged three warranty deeds to Sam and Elsie Harris, husband and wife, the latter being his stepdaughter but, as the evidence shows, was in a close relationship to him. Alva delivered these deeds, along with an executed will (which disposed of personal property only), to Elsie about 4:00 p. m., Friday January 15, 1965, in the yard of her home. She placed them on a kitchen table and Sam read them and replaced them on the table when he came in from work that evening. The deeds were recorded the following Thursday, January 21. Neither Sam nor Elsie ever exercised any control over or possession of Alva's property prior to his death. It was admitted that the three deeds were a gift, and Alva never asked for return deeds. At the time Alva delivered the deeds he acted as though he was in a rush. Sam testified that Alva had been talking about having the deeds made, and he knew that he was doing so, but he did not discuss the deeds with Elsie. Sam, as executor of Alva's estate, participated in making up the inventory therein: Furniture, household goods, wearing apparel at $600 (according to Elsie the household goods sold for $100); 1952 Hudson $25; 1952 Chevrolet panel truck $50; 1963 Harley-Davidson motorcycle $400; miscellaneous

carpenter tools $150, a total of $1,225. It does not appear what, if any, claims were allowed against Alva's estate by the Probate Court. The motorcycle was ridden by Alva shortly prior to his death, he being in good health and an active man for his age. On December 8, 1964, and again on January 15, 1965, he issued $3 checks for vitamins he was taking, and on December 30, 1964, he issued a $15 check for his 1965 truck license.

■ It is clear that plaintiff does not occupy the position of an existing creditor who had that status at the time Alva's deeds were delivered to defendants and before the tort was committed by Alva upon Hazel. Plaintiff's right to recover depends upon whether at the time Alva delivered the deeds he had an actual fraudulent intent to hinder, delay or defraud plaintiff as a *subsequent* judgment creditor. McKinney v. Hutson, 336 Mo. 867, 81 S.W.2d 951, 956. Missouri's statute on fraudulent conveyances, in portions here applicable, is § 428.020, RSMo 1959, V.A.M.S.: "Every conveyance or assignment in writing, or otherwise, of any estate or interest in lands, * * * made or contrived with the intent to hinder, delay or defraud creditors of their lawful actions, damages, forfeitures, debts or demands, * * * shall be from henceforth deemed and taken, as against said creditors and purchasers, *prior and subsequent*, to be clearly and utterly void." (Italics added.) Without any doubt this statute, by its terms, applies to creditors who come into existence after a conveyance is made with intent to hinder, delay and defraud them. Snyder v. Free, 114 Mo. 360, 21 S.W. 847, 850, 851; Lander v. Ziehr, 150 Mo. 403, 51 S.W. 742; Johnson et al. v. Murphy et al., 180 Mo. 597, 79 S. W. 909; and Clark v. Lewis et al., 215 Mo. 173, 114 S.W. 604. See also 37 C.J.S. Fraudulent Conveyances § 69, p. 912; 37 Am.Jur.2d Fraudulent Conveyances § 139, p. 813.

■ That a subsequent tort claimant comes within the protection afforded a

creditor who becomes such after a fraudulent conveyance is well established. "[t]he well-nigh universal rule is that claims for damages arising from torts and not yet reduced to judgment are within the protection of the statutes against fraudulent conveyances, on the theory that where a conveyance is made after the liability accrued, but before suit, the judgment, once obtained, relates back and becomes a debt as of the time when the original cause of action accrued." 37 C.J.S. Fraudulent Conveyances § 75, p. 915. The usual case of a claim of fraudulent conveyance as to a subsequent tort claimant arises where the tort is committed, then a conveyance is made with intent to avoid a possible later judgment. See Annotations, 39 A.L.R. 179; 73 A.L.R. 2d 750; and representative of such cases: Lange v. Semanske et al., 108 N.J.Eq. 538, 155 A. 783; Edwards v. Monning et al., 63 Ohio App. 449, 27 N.E.2d 156 (aff'd 137 Ohio St. 268, 28 N.E.2d 627); Eldredge v. Geer, 118 Conn. 458, 173 A. 110; Downs v. Powell, 215 Ga. 62, 108 S.E.2d 715. Extensive research has revealed no cases precisely involving the unusual facts which are here present of a conveyance first being made, then an intentional tort committed, which resulted in subsequent judgment creditors in a wrongful death action. (But see Boid v. Dean, infra.) There are, however, analogies. Compare the situation of a person who plans to enter a hazardous business undertaking and who first conveys away his property. It is generally held that a subsequent creditor may reach the previously, fraudulently conveyed property, although the act actually causing insolvency of the debtor occurs later. 37 Am.Jur.2d Fraudulent Conveyances §§ 141, 143, pp. 815, 817.

Boid v. Dean, 48 N.J.Eq. 193, 21 A. 618, had facts showing that a former partner, Dean, of plaintiff, Boid, conveyed his property to his wife eleven months prior to the recovery of judgment and prior to making slanderous statements against Boid. There was evidence of disputes and wrangles and anger of Dean against Boid, and that Dean had said he would ruin Boid. As to the matter of Dean's conveyance to his wife, the court had this to say, loc. cit. 21 A. 622: "The principle which underlies it is that there is no distinction in this respect between a cause of action founded upon tort and one founded upon contract. Each are equally entitled to be protected against voluntary transfers of property. If this is so, then it seems plainly enough to follow that, if a transfer be made for the purpose of immunity against torts thereafter to be committed, it is open to the same objection as if made to avoid paying future contractual obligations. In fact, it seems to me that the party who suffers from a tort stands on higher ground in this respect than one who suffers from a broken contract, and that the argument from the latter to the former is *a fortiori,* since he who contracts with another does so voluntarily, and with opportunity to inquire and investigate into the responsibility and reliability of his debtor, while the sufferer from tort has no opportunity to avoid injury. It would, I think, be a startling proposition to advance that a man holding spite and enmity against his neighbor may place the title of all his property in his wife, where he can fully enjoy it, and then proceed with impunity to gratify his spite by slandering his neighbor." Also, there is authority (with some to the contrary) that a conveyance prior to the act for which a fine was imposed should be set aside, on a showing that the conveyance was made to prevent the collection of a fine. State v. Burkeholder, 30 W.Va. 593, 5 S.E. 439 (where, on demurrer, the allegations of the original and amended bills that the conveyance was made to delay, hinder and defraud the state were taken as true. The acts there, of illegal sales of liquor, occurred after the conveyances alleged to be fraudulent). Anno. 48 A.L.R. 605. And see Carrell v. Meek, 155 Mo.App. 337, 137 S.W. 19, 21, where Carrell and his wife (the plaintiff who sued to enjoin an execution sale) conveyed all his property to his brother who reconveyed to plaintiff. There was evidence that the conveyance was made by Carrell because of apprehension of suit by

a barber's wife, which suit was never brought. Later, while the title to the property was still in plaintiff wife though the deed was unrecorded, Carrell assaulted another which resulted in a judgment against him. After the assault cause of action arose the deed was recorded, for the purpose, as was held, to ward off the new trouble, "the wife's name is being used merely as a hiding place for the husband's property to shield it from the assaults of his judgment creditor." Note that in this case the conveyance was made in anticipation of a suit by the barber's wife, not to avoid a judgment arising out of the later assault. Yet the court concluded that Carrell was still the owner of the property and was attempting to secrete it from his creditors. The conclusion is that plaintiff does have a claim to set aside Alva's deeds because, as alleged, they are fraudulent as to their subsequent judgment for wrongful death. The case then turns upon the sufficiency of the evidence to sustain that claim. This matter is that which is vigorously briefed and argued by the parties.

Defendants' position is that the evidence falls short of proving:

(a) That at the time of the transfer Alva contemplated deliberately killing Hazel; and

(b) That at the time of the transfer he then knew that his act in deliberately killing Hazel would occasion a pecuniary loss in Hazel's adult, married children; and

(c) That at the time of the transfer he had an actual expressed intent to defraud those adult, married children.

Expanding this position, defendants say that there was no proof that Alva ever threatened to kill Hazel; that he ever did her any bodily harm before the date of death (the evidence of his destruction of one of his gifts to her cannot be tortured into a purpose to do her physical harm); and there was no proof as to how the death occurred except the note (above set out).

It is said further that under Count I the jury found generally upon the issues in favor of plaintiff. The issues were pleaded and were submitted in Instruction No. 2 alternatively on that count that if the jury believed that the shooting was either the result of Alva's negligence or was purposely done by him with intent to harm Hazel. Hence, defendants say, there was no finding of a deliberate act at any time. They say that the record is barren of evidence upon the questions of: When did Alva determine (if he did) that Hazel should die? Did he ever have a preconceived intent to kill Hazel? Was her death in a storm of passion? Was she killed in a struggle over a gun when he tried to kill himself? With respect to the note left by Alva in Hazel's home, defendants say that here is a man disposing of his body, and supports the idea that the January 15, 1965 transfer was in contemplation of his own death; that it is incredible and a fantasy that he could write the note and have intended to cheat and defraud Hazel's children at the same time. Defendants conclude that lawsuits, the death acts and creditor's rights never entered Alva's mind; and that "every act of Alva Caldwell shows that he had determined to leave this vale of tears and was disposing of his affairs in a way 'to avoid probate.'"

Plaintiff relies upon all of the circumstantial evidence in the case and in connection therewith certain "badges of fraud" to show that Alva had a fraudulent intent to put his property beyond the reach of Hazel's heirs as subsequent judgment creditors. "'Intent or intention is an emotion or operation of the mind, and can usually be shown only by acts or declarations, and, as acts speak louder than words, if a party does an act which must defraud another, his declaring that he did not by the act intend to defraud is weighed down by the evidence of his own act.'" Snyder v. Free, supra, loc. cit. 21 S.W. 851. See also Castorina v. Herrmann, 340 Mo. 1026, 104 S.W. 2d 297, 302, "[F]raud may, like any other fact, be established by circumstantial evidence. (Citing cases) Actions sometimes

speak louder than words and acts are circumstances to be considered." In Allison v. Mildred, Mo., 307 S.W.2d 447, 453[2], it is said, "While it is undoubtedly true as a general legal proposition that 'fraud is not to be presumed, but must be proved by the party alleging it,' yet it is equally true, that fraud is seldom capable of direct proof, but for the most part has to be established by a number and variety of circumstances, which, although apparently trivial and unimportant, when considered singly, afford, when combined together, the most irrefragable and convincing proof of a fraudulent design. (Citing cases)." Here, although Alva made no direct declaration of his purpose in delivering the deeds to his stepdaughter, Elsie, Sam did testify that Alva had been talking about having the deeds made, and he knew he was doing so. Sam's testimony was for the trial court to believe or disbelieve, and if Alva did make such a statement it was outweighed by other circumstances and legitimate inferences present in the case.

At sometime prior to the killing of Hazel, Alva had to formulate his intention to do so. This was an intentional act, as may be found from Alva's use of the deadly weapon, the revolver. The record is not barren of circumstances that prior to January 15, 1965, the date of delivery of the deeds, Alva determined that Hazel should die, and had a preconceived intent to kill her. The prior good relations of the two had deteriorated sometime around the first of January when Alva, in an apparent vengeful pique, destroyed the Christmas presents he had given Hazel and the aerosol shaving cream she had given him. The evidence is in the record that Hazel feared Alva and had told him not to come down to her house on that fateful Sunday. She wanted to break off the relationship they had, and he did not want to. Alva's anger is consistent with that of a spurned lover. And the statement of Hazel, as related by Earnest, "If I can't have you, I'll see no one else can," taken in context with all of Earnest's testimony of what Hazel told him, clearly indicates that they were Alva's words and not Hazel's. It may reasonably be inferred that Alva, as a spurned lover, meant to do Hazel some physical harm to prevent someone else from having her. That purpose was carried through to the actual killing on Sunday, January 17. The facts and circumstances show that Alva met Hazel at the church, he being in her light colored car awaiting her. From her statements to Earnest, Alva's being there was against her will. Sometime afterward, the two must have left Hazel's car on the Bolivar square and must have gone in Alva's black Hudson to her home. There, the struggle between the two soon took place, which resulted in Hazel being shot by Alva's revolver. That revolver misfired thereafter, as shown by the bullets imprinted by the firing pin, and the note left by Alva. He was still alive when the men from the funeral home telephoned Hazel's home and a man answered. It must have been thereafter that he accomplished his further purpose of taking his own life, which necessitated his going after the instrument of his own death, the shotgun, also shown by his note. The struggle which occurred, as shown by the disarray of the articles of the room and Hazel's injuries, is not consistent with an accident in which Hazel sought to prevent Alva from killing himself. The evidence points to *his* purpose of harming her, and the inference is that Hazel was attempting to protect herself from Alva's assault.

If there were no property transfers involved, the only inferences which could be deduced from Alva's note are that his suicide and the disposition of his body were contemplated. In connection with the property transfers, there are other inferences. First, that of Alva's intention to harm Hazel, his spite and ill will toward her. Then, on January 5, he withdrew $2,500 from his joint bank account. This money was never found, and, although a joint account with Elsie, it reduced his cash assets very substantially. His personal property (of which there was little left) was disposed of by his will. His real estate, comprising

the bulk of his estate, was deeded (without consideration) to Sam and Elsie less than two days prior to the shooting. For all practical purposes this rendered him insolvent as to incurring future liabilities. The real estate was placed beyond the reach of any possible subsequent judgment creditors. This is one of the very important badges of fraud which is for consideration in fraudulent conveyance cases. 37 Am.Jur.2d Fraudulent Conveyances, § 10, p. 701; Bank of New Cambria v. Briggs, 361 Mo. 723, 236 S.W.2d 289, 291[2–7]. Another badge of fraud is the short length of time intervening between the delivery of the deeds and Hazel's wrongful death, and Alva's haste in delivering the deeds to Elsie on Friday, January 15. Especially is this short-time interval significant in connection with the evidence tending to show that Alva was possessed of an intention at the time to do Hazel harm. But because, also, of that short-time interval, no significance should be attached to Alva's retention of possession of his property or to the failure to immediately record the conveyances. As testified to by Sam, Alva's funeral arrangements had to be made the week following, hence there would reasonably be no time available for such recordation.

It is here admitted that the deeds made and delivered by Alva were without any consideration and were to his stepdaughter (related to him by his marriage to her mother) and her husband, Sam, both of whom stood in a close family relationship to him. These facts may also be considered as badges of fraud. 37 C.J.S. Fraudulent Conveyances §§ 81, 251, pp. 923, 1083; Allison v. Mildred, supra; Harrison v. Harrison, Mo.App., 339 S.W.2d 509, 516.

In addition to the foregoing, it must be concluded that Alva knew of the consequences of his intended act of wrongfully killing Hazel. This knowledge would extend to the consequence of a wrongful death action being brought by Hazel's heirs, and that this being an intentional act, without justification or excuse, as the evidence shows, there would be but little question that some damages would be awarded them. In Snyder v. Free, supra, loc. cit. 21 S.W. 851, an allusion is made to this aspect of this case: " 'If the necessary consequence of a conceded transaction was defrauding another, then, as a party must be presumed to have foreseen and intended the necessary consequences of his own act, the transaction itself is conclusive evidence of a fraudulent intent, for a party cannot be permitted to say that he did not intend the necessary consequences of his own voluntary act.' " See Gibson v. Frowein, Mo., 400 S.W.2d 418, 421[3–5], where it is said, "[a]n action for alienation of affections is based on inherently wrongful acts of the defendant intentionally done which have the natural and probable consequence of alienating the affections of the spouse of the plaintiff, and which in the particular case had that result." See also 31A C.J.S. Evidence §§ 130–131, pp. 241, 243. Furthermore, Alva is presumed to know of the statutes on wrongful death and fraudulent conveyances (§ 428.020, supra) as applied to his conveyance to defeat collection of a subsequent judgment creditor as a result of the wrongful death. See and compare St. Louis Union Trust Co. v. Krueger, Mo., 377 S.W. 2d 303, where a testatrix was presumed to know that charges against her estate would have to be paid before her legatees; and 31A C.J.S. Evidence § 132(1), p. 245. All of the facts and circumstances above set forth show that Alva was possessed of spite and ill will toward Hazel. He proceeded to divest himself of practically all of his property without any consideration therefor. The reasonable conclusion is that he did so in order to murder Hazel with impunity as to payment for any damages his estate might later be liable for upon final judgment. Boid v. Dean, supra. The existing badges of fraud, the facts, circumstances, the legitimate inferences to be drawn therefrom, and the presumptions applicable to the case, all concurring, support the trial court's findings that the conveyances were in fraud of plaintiff's rights as a subsequent judgment creditor.

Plaintiff, for her cross-appeal, urges that the trial court erred in allowing defendants a credit of $2,609.15 for time and money expended on the property because "(A) The expenditures were made after defendants had been notified that they did not have good title and that plaintiff intended to have the conveyances to defendants set aside"; and "(B) There was no competent evidence that the expenditures made by the defendants resulted in permanent improvements or, if they did so, the amount, if any, by which they have enhanced the value of the property." Meeting these contentions, defendants say they had no actual notice of an outstanding better title in the property at the time of the transfer, and that they did not participate in any fraudulent purpose of Alva.

Without a doubt defendants did have actual, written notice of plaintiff's claim through a letter written by her former counsel, the Honorable Charles Barker (now Judge of the 30th Judicial Circuit of Missouri), to defendants. That letter further advised that plaintiff would like to work out a settlement without having to file a suit to set aside the conveyances. Before receiving the letter, Sam Harris had spent eleven hours working on the property, and upon advice of his counsel thereafter made further expenditures to the total claimed and found by the trial court. Sam's counsel advised him that he should keep a record of the time and money spent on the place so he could be reimbursed if the deeds were ultimately set aside.

The authorities cited by plaintiff holding "that notice and good faith cannot co-exist" are principally actions at law as for ejectment where absolute good faith must be present in order to allow an occupant his improvements made. See Lee v. Bowman, 55 Mo. 400, 403; Glassburner v. Burtrum, Mo., 418 S.W.2d 119, 122; and 42 C.J.S. Improvements § 7, p. 436. In Brandon v. Stone, 237 Mo.App. 671, 162 S.W.2d 83, 86, the principal and first suit was to set aside a trustee's deed under which defendant claimed, and it was held, that he was not a good faith improver because he had notice of plaintiff's claim of title adverse to his. But the significant and distinguishing factor in the Brandon case is that of defendant's conduct in chilling a sale in the foreclosure suit where he received his trustee's deed which was set aside as being void.

 This is a suit in equity to set aside deeds fraudulent as to creditors. The situation is different than in an action at law. "A court of equity, or a court possessing equitable jurisdiction, has inherent power, as a part of its general jurisdiction, to allow or compel a set-off." 80 C.J.S. Set-off and Counterclaim § 5, p. 10. As observed by the trial court, defendants were innocent of any wrongdoing. They went ahead with their improvements and betterments upon advice of counsel that they could be reimbursed therefor if the deeds were set aside. Those improvements and betterments enhanced the value of the property, and if defendants were not paid therefor the result would be an unjust enrichment, a windfall, to plaintiff. The trial court was not in error in allowing defendants the value of their improvements as a set-off, in order to do what was right and in equity between the parties and as a condition to the equitable relief granted plaintiff. Controlling is the principle stated in Lester v. Tyler, Mo., 69 S.W.2d 633. That case was an action in ejectment, met with a claim of adverse possession of defendant, and a count in partition. The trial court decreed partition but found that defendant did not make improvements in good faith and was not entitled to any allowance therefor. Apparently, defendant had notice that plaintiffs were claiming the property, but believed that his own adverse possession title was good based upon advice of counsel, and that "it was safe to go ahead." At 69 S.W.2d 638[13–16] it was said: "Allowance for improvements is not a legal right but is based upon principles of equity and allowances for rental value of interests of cotenants, kept out of possession, may also be considered in connection therewith. (Citing cases) * * * The value of the im-

provements in this case is apparently many times the value of the land and we think that justice and equity require a further consideration of this question on its merits." See also 42 C.J.S. Improvements § 6, p. 428.

Apparently, the trial court allowed defendants the amount which they had actually expended on the property. There is some question whether certain labor performed by defendants, such as mowing the yard, is a permanent improvement. Taxes paid by defendants (which would not have to be paid by plaintiff or from sale proceeds) and insurance to protect the property from loss, to plaintiff's benefit, should be allowed. The true measure of the extent of recovery is not the cost of improvements but the amount the value of the property has been enhanced by reason of the improvements. Anno. 24 A.L.R.2d 11, 31; Staub v. Phillips, 307 Mo. 576, 271 S.W. 365, 368[2]; McAboy v. Packer, 353 Mo. 1219, 187 S.W.2d 207, 210[8, 9].

The evidence shows that the buildings on Alva's premises, a house and a barn, had a total reasonable monthly rental of $70 per month before repairs were made on the house, and $95 per month after the repairs of 1965. The trial court allowed plaintiff the rentals they had actually received from October 13, 1965 to the date of the judgment ($1,316.13). Defendants admitted that they had been in possession of the property since January 15, 1965, and would remain in possession until the property was ordered by court to be relinquished. The rule is that an occupant is responsible for rents and profits accruing on the land from the time he takes possession until he relinquishes it. 42 C.J.S. Improvements § 12 (b), p. 449; Lee v. Bowman, supra; Brandon v. Stone, supra; Hunter v. Delta Realty Co., 350 Mo. 1123, 169 S.W.2d 936. The trial court should find the reasonable rental value of the premises as shown by the evidence from the date of first possession by defendants until they relinquish it.

The judgment upon Count III, setting aside the deeds, is affirmed. The judg-

ments of set-off and allowance of plaintiff's rental values (Count V) are reversed, and the case is remanded for further proceedings and for consideration of the amount which defendants' permanent improvements have enhanced the value of the property, and for a recomputation of the reasonable rental value of the premises during defendants' entire time of possession.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.