**Richard E. BUTLER, As Trustee of the Richard E. Butler Revocable Living Trust, et al., Plaintiffs/Appellants,**

**v.**

**MITCHELL–HUGEBACK, INC., et al., Defendants/Respondents.**

**No. 77342.**

Supreme Court of Missouri, En Banc.

March 21, 1995.

Rehearing Denied April 25, 1995.

HOLSTEIN, Judge.

Defendant Hensley Construction, Inc. (Hensley) is the original contractor, and defendants John J. Smith Masonry Company (Smith), Kupferer Brothers Ornamental Iron Works (Kupferer) and Big Boy's Steel Erection (Big Boy) are original subcontractors who erected a warehouse in 1980. The warehouse collapsed in 1991. Mitchell–Hugeback, Inc. (Mitchell), is the designer of a 1990 retrofit of the warehouse done under contract with the owner of the building, plaintiff R.E. Butler Real Estate (Butler). The trial court granted summary judgment as to the original contractor and subcontractors pursuant to the ten-year statute of limitations found in § 516.097.[1] Summary judgment was entered in favor of Mitchell because of a waiver clause in its contract with the plaintiff. Following opinion by the Missouri Court of Appeals, Eastern District, this Court granted transfer. *Rule 83.03.* The orders of summary judgment are affirmed in part and modified and reversed in part.

In reviewing an appeal from a summary judgment, uncontradicted facts set forth in the pleadings, discovery or affidavits presented to the trial court are taken as true, according the nonmovant the benefit of all reasonable inferences. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). The facts recited below are either uncontradicted or, if inferences are required, they are taken as favorable to the plaintiffs.

Hensley undertook to build a warehouse in Fenton, Missouri, under a contract with Butler's predecessor in title. Hensley subcontracted some of the work to Smith, including construction of steel reinforced pilasters which provided a part of the needed structural support. Truss girders of structural steel were set on top of the pilasters. Hensley subcontracted the structural steel work to Kupferer, who in turn subcontracted the truss girder installation to Big Boy. The work was completed in 1980.

Butler purchased the building in 1990. It suddenly collapsed in 1991. The plaintiffs' experts found two defects which contributed

Henry E. Menghini, Mary K. Fitzgerald, St. Louis, for appellants.

Paul E. Kovacs, Gary P. Paul, Aaron I. Mandel, Clayton, Louis J. Basso, Gary E. Snodgrass, Joseph L. Leritz, Robyn G. Fox, F. Douglas O'Leary, Bryan M. Groh, St. Louis, for respondents.

---

**1.** All references to statutes are to RSMo 1994 unless specified otherwise.

to the collapse. The "number one instrument" causing the collapse was that there were insufficient steel reinforcing bars placed in the hollow core of the pilasters before concrete was poured in. The building plans required that four reinforcing steel bars be placed in each corner of the hollow center of each pilaster. Local building codes require that where reinforcing steel is spliced that it have at least a twelve-inch overlap. One of the collapsed pilasters was found to have no steel reinforcing bars in the top four-foot section. In other pilasters the lap splice was found to be only one to four inches. Once the concrete is poured, it is impossible by visual inspection to determine if the reinforcing rods are present or if the splices overlap properly.

The second defect noted by the experts relates to spacer or connector bars located at the end of the truss girder where the girder rests above the pilaster. The truss girder is composed of four L-shaped angle irons, the upper two referred to as "top chord angles" and the lower two as "bearing shoe angles." The bearing shoe angles are welded to a square steel bearing plate. The bearing plate is attached by two anchor studs to the top of the pilaster. At or near the end of the truss girder are two spacer bars which separate and connect the four angle irons where the girder sits on the bearing plate. The spacer bars at the ends of the girder provide stability to prevent the bearing shoe angles from rotating or shifting on the bearing plate.

The end of the truss girders were cut with a torch when the building was being constructed. The cut resulted in the outermost spacer bar being removed. Expert testimony indicates that the cutting of the girders so as to remove the outer spacer bar weakens the truss girder and is contrary to accepted construction and engineering practices. The affidavits and depositions of expert witnesses indicate that after the completion of the work, the cut end with the missing spacer bar could be observed, but only with some difficulty. The roof, pilaster and masonry wall nearly enclosed the ends of the truss girders, leaving only a small opening. However, it is clear that the cut ends could have been observed by a visual inspection after they were put in place but before the roof deck or upper portion of the masonry walls were erected.

Butler purchased the warehouse in 1990 intending to retrofit a portion of the warehouse as its corporate headquarters. Defendant Mitchell was selected as the architect to design the retrofit. Weintraub and Associates [2] was selected by Mitchell to provide structural engineering services for the retrofit. Musick Construction entered into a contract with Butler to perform the work called for in the Mitchell plans as provided in an agreement signed July 5, 1990.

In August, 1990, the condition of certain courses of the upper masonry were examined by a St. Louis County building inspector. His impression was they had "almost exploded," indicating structural distress. One of Weintraub's employees documented his concern that the failure of the upper courses of masonry might be due to poor construction of the pilaster. Butler moved into the facility in late November or early December of 1990. On December 28, 1990, the ceiling in the office portion of the warehouse was noticeably sagging, and an accordion door normally several inches off the ground was observed to be touching the floor. Mitchell was contacted. They assigned the problem a new work order number. Weintraub employees undertook an investigation. After the building was examined by Weintraub's employee, it was determined that the warehouse was over-stressed. It was recommended that Butler remove the ice and snow from the roof. Despite these efforts, the warehouse collapsed on January 5, 1991, causing substantial damage to the structure and property inside the structure as well as other business losses.

Three documents made up Butler's agreement with Mitchell and Musick. These documents contained provisions relating to property insurance and waiver of claims for sub-

2. Weintraub was a defendant. However, it was dismissed without prejudice prior to filing this appeal.

rogation. The documents will be discussed in detail *infra.*

Motions for summary judgment by Hensley, Smith, Kupferer and Big Boy were sustained based on the statute of limitations of § 516.097. The motion for summary judgment by Mitchell was sustained because of the provisions of the contract documents involving Butler, Mitchell and Musick noted above.

## I.

■ As previously noted, § 516.097 establishes a ten-year statute of limitation on claims for damages due to a defective or unsafe condition of an improvement on real property brought against persons whose sole connection with the improvement is in the design, planning or constructing the improvement. However, that statute of limitation does not apply if

[a] person conceals any defect or deficiency in the design, planning or construction, including architectural, engineering or construction services, in an improvement for real property, if the defect or deficiency so concealed directly results in the defective or unsafe condition for which the action is brought.

§ *516.097.4(2).*

## A.

In *Magee v. Blue Ridge Professional Building Co.,* 821 S.W.2d 839 (Mo. banc 1991), this Court defined the word "conceals," as used in § 516.097 as "an affirmative act, something actually done directly intended to prevent discovery or to thwart investigation." *Id.* at 844. Butler asserts that *Magee* should be overruled, arguing that the word "conceals," as used in § 516.097, has no requirement of scienter or culpability. This argument relies on several canons of statutory construction.

The primary argument of Butler is that the legislative history of the house of representatives bill by which § 516.097 was enacted reveals that the word "knowingly" was removed as a modifier of the word "conceals" before the bill was passed by either house or signed into law by the governor. From this, Butler argues that the legislature must have intended to remove any requirement of culpability. The argument assumes too much. Words are routinely removed from bills during the course of the legislative process. Words may be deleted for many reasons, including because they are considered redundant, confusing or extraneous. Because it is speculative as to why the house of representatives deleted the word "knowingly" from the bill in question, reliance on such legislative history to construe the statute is not highly persuasive.

■ All canons of statutory interpretation are subordinate to the requirement that the Court ascertain the intent of the legislature from the language used and give effect to that intent, if possible, and to consider the words used in their plain and ordinary meaning. *Trailiner Corp. v. Director of Revenue,* 783 S.W.2d 917, 920 (Mo. banc 1990). "Conceals" has several shades of meaning, ranging from "refrain from revealing" to the more active "prevent disclosure." But regardless of which shade one chooses, the word connotes something more than merely covering over or not informing. Conceal "often implies a certain design or artfulness." *Webster's Third New International Dictionary* 469 (1981). Had the legislature intended to toll the statute of limitations of § 516.097 in every case except those relatively few cases involving open or uncovered defects or where the owner was informed of the defect, it could have used those words. However, it did not. Instead, the General Assembly chose a word which carries the implication of intentional conduct designed to prevent discovery.

■ The meaning of a word must depend to some extent on the context in which it appears. *City of Willow Springs v. Missouri State Librarian,* 596 S.W.2d 441, 445 (Mo. banc 1980). The context here is a statute of limitations. The General Assembly is presumptively aware of this Court's prior decisions establishing rules for construing statutes of limitation and their exceptions. Statutes of limitation are favored in the law and cannot be avoided unless the party seeking to do so brings himself strictly within a claimed exception. *Hunter v. Hunter,* 237

S.W.2d 100, 104 (Mo.1951). Statutory exceptions are strictly construed and are not to be enlarged by the courts upon consideration of apparent hardship. *Id.* To construe the word "conceals" broadly to mean merely to "cover over" or to "not inform" would, in effect, cause the exception to consume the statute of limitation and defeat the legislative purpose. Almost any structural or mechanical defect conceivable will be covered by walls, floors or ceilings in modern buildings. The legislative purpose and the meaning of the word "conceal" is sufficiently clear to communicate an element of scienter. There is no reason to overrule the precedent of *Magee.*

### B.

■ This leaves two questions to be answered. The first for consideration is whether there is a genuine issue of fact that Hensley, Kupferer or Big Boy concealed any defects in the truss girders. A defective condition that is concealed is one that is not discoverable by reasonable diligence. *See Swope v. Printz,* 468 S.W.2d 34, 37 (Mo. 1971), and *Siler v. Kessinger,* 149 S.W.2d 890, 893 (Mo.App.1941). This record indicates that the defect in the trusses could have been discovered by reasonable visual inspections during the course of construction. The construction project obviously required a series of tasks to be performed after the truss girders were cut and put in place atop the pilasters. Had the owners or their representatives been reasonably diligent to inspect the girders before the masonry walls were completed or before the roof deck was put on the building, the cut ends of the girders would have been discovered. Even after such work was done, a diligent examination may well have disclosed the defect in the girders. Lack of diligence by plaintiffs and earlier owners negates any claim of concealment. Summary judgment as to Hensley, Kupferer and Big Boy on the claim of negligent installation of the truss girders must be affirmed.

■ The more difficult question has to do with the failure of Hensley and Smith to place proper reinforcing rods before pouring the concrete in the hollow pilasters. The placement of the rods and the pouring of the concrete into the hollow pilaster is arguably a single task. Once the task is complete, it is impossible to determine whether the reinforcing steel had been properly placed in the pilaster. The plans, specifications and applicable standards called for reinforcing rods and that the splices on the reinforcing rods meet certain overlap requirements. By the act of pouring the concrete, the absence of steel reinforcement was immediately concealed from the owner of the property. At minimum, a factual question exists as to whether a diligent owner could have discovered the absence of proper steel reinforcement by timely inspections. Whether Hensley and Smith were merely negligent or whether they acted with the intent to prevent discovery of the improper steel reinforcing rods when they poured the concrete into the pilasters or thereafter intended to thwart discovery of the defects by failing to disclose the condition are factual questions that are necessarily left up to the fact-finder. Intent in nearly every case is proven by circumstantial evidence, and failure to provide direct evidence of such intent is an improper basis for summary judgment. *Wagner v. Uffman,* 885 S.W.2d 783, 786 (Mo.App.1994); *Estate of Heidt,* 785 S.W.2d 668, 670 (Mo.App.1990).

The issues of whether Hensley and Smith intended to conceal the defective pilasters and whether inspection by a diligent owner during the course of construction would have disclosed that defect remain unresolved. Summary judgment as to those issues is reversed.

### II.

As previously noted, the agreements regarding the 1990 retrofit involved three documents. The first was the owner/architect agreement between Butler and Mitchell, referred to as AIA Document B151. Article 9 of that document provides in part:

9.4 The Owner and Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, but only to the extent covered by property insurance during construction, except such rights as they may have to the proceeds of

such insurance as set forth in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

The second document is the owner/contractor. agreement between Butler and Musick, referred to as AIA Document A111. This agreement incorporates AIA Document A201, General Conditions of Contract for Construction (General Conditions), the same document referred to in the owner/architect agreement.

The General Conditions contain Article 11, titled "Insurance and Bonds." In relevant part, it provides:

11.1 CONTRACTOR'S LIABILITY INSURANCE

11.1.1 The contractor shall purchase ... such insurance as will protect the contractor from claims set forth below which may arise out of or result from the contractor's operations under the contract and for which the contractor may be legally liable....

. . . .

.5 claims for damages other than to the Work itself because of injury to or destruction of tangible property, including loss of use resulting therefrom:

11.3 PROPERTY INSURANCE

11.3.1 Unless otherwise provided, the Owner shall purchase and maintain ... property insurance in the amount of the initial Contract Sum as well as subsequent modifications thereto for the entire Work at the site on a replacement cost basis without voluntary deductibles....

11.3.1.1 Property insurance shall be on an all-risk policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including ... collapse....

. . . .

11.3.7 Waivers of Subrogation. The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, ... for damages caused by fire or other perils to the extent covered by property insur-ance obtained pursuant to this paragraph 11.3 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary.

The cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent. *Royal Banks of Missouri v. Fridkin*, 819 S.W.2d 359, 362 (Mo. banc 1991). In order to determine the intent of the parties, it is often necessary to consider not only the contract between the parties, but "subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances that cast light on the intent of the parties." *Id.* In this case, all three documents must be read to capture what was intended.

Butler first argues that the General Conditions were not incorporated into the owner/architect agreement. Thus, Mitchell, not being a party to the owner/contractor agreement, may not claim the benefit of the General Conditions. Butler notes the only waiver of subrogation found in the owner/architect agreement is found under article 9.4 for damages occurring "during construction." He claims construction was completed when the collapse occurred.

This argument fails to acknowledge that there are clear provisions in the owner/contractor agreement relieving the architect of liability "for damages caused by fire or other perils to the extent covered by property insurance." Because Mitchell is a third-party beneficiary of that contract, it is entitled to the benefit of the agreement. It is not necessary for one to be a party to a contract to claim its benefits. *Peters v. Employers Mut. Casualty Co.*, 853 S.W.2d 300, 301 (Mo. banc 1993).

Butler's second argument is that even if the General Conditions are applicable, the waiver is limited to the value of the "Work." As noted, article 11.3.7 of the General Conditions grants a waiver of all rights

"to the extent covered by property insurance obtained pursuant to paragraph 11.3 or other property insurance applicable to the Work...." "Work" is defined in article 1.1.3 of the general conditions as "the construction and services required by the Contract Documents, whether completed or partially completed and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations." The obvious meaning of the quoted provisions of article 11.3.7 is that the waiver of subrogation is only effective to the extent of the value of the "Work."

This interpretation is strengthened by provisions of article 11.1.1, which requires the contractor to purchase and maintain insurance for damages in excess of the value of the work itself. The trial court's summary judgment in favor of Mitchell is affirmed in part but modified to hold that Butler waived its rights to recovery against Mitchell only to the extent of the value of the "Work." If it is determined that Mitchell was negligent in performing its services under the contract, it may be held liable for damages in excess of the value of the "Work."

■ Butler's third contention is that the work performed by Mitchell in December of 1990 and January of 1991 was not done pursuant to the owner/architect agreement. Thus, neither the owner/architect agreement nor General Conditions were applicable. Butler contends that Mitchell sent Butler a final invoice dated November 19, 1990, stating that the work was "100 percent complete." Butler paid the invoice on December 3, 1990. The architect's responsibilities under section 2.4.1 of the owner/architect agreement did not terminate until the final certificate of payment was issued or sixty days after the date of substantial completion, whichever occurred earlier. In addition, Butler was required to maintain property insurance until final payment was made as provided in paragraph 9.10 or "until no person or entity other than the Owner has an insurable interest in the property." That paragraph provides the architect to perform an inspection and, if the contract is fully performed, issue a final certificate of payment. In this case, there is nothing to indicate that a final certificate of payment had been issued. Also, if November 19, 1990, is

the date of substantial completion, Mitchell performed the roof analysis within sixty days from that date. Because obligations among the parties continued in late December, insurance was required to be maintained under the agreement. In addition, Musick still had an insurable interest in the project. Under article 11.3.1 of the General Conditions, so long as the insurance was required to be maintained under the agreement, the waiver provisions of article 11.3.7 were in effect. Notwithstanding that the "roof analysis" was done under a different job number than that used during the retrofit, the construction contract and waiver of subrogation provisions of the General Conditions were still in effect.

The trial court's entry of summary judgment in favor of defendants Kupferer and Big Boy is affirmed. The grant of summary judgment in favor of Hensley is affirmed in part and reversed in part. The summary judgment in favor of Smith is reversed. The summary judgment in favor of Mitchell is affirmed in part and modified and reversed in part. The cause is remanded to the trial court for further proceedings consistent with this opinion.

All concur.