**Leslie M. BURNS, Susan Carpenter, Paula Virden and Judith S. Knight, Plaintiffs–Appellants,**

v.

**PLAZA WEST ASSOCIATES and Fred C. Kay, Defendants–Respondents.**

**Nos. WD 54911, WD 54958.**

Missouri Court of Appeals, Western District.

Nov. 17, 1998.

---

7.  The exception in § 536.140.4 is not applicable    in this case.

Roy Walters, Kansas City, for appellants.

Cynthia Reams, Kansas City, for respondents.

FOREST W. HANNA, Judge.

This case was submitted to the circuit court of Jackson County on a stipulation of facts and on additional facts presented in a subsequent hearing. Both parties appeal from the trial court's amended judgment of August 13, 1997. The plaintiffs are certain limited partners who sought and recovered reimbursement of $94,276.61, the amount collectively paid by the plaintiffs on their guarantees to Southgate Bank. The defendants, Plaza West Associates and its sole general partner, Fred Kay, appeal from that part of the judgment. The defendants also filed a counterclaim against the limited partners seeking payment of monies due from the limited partners for failure to respond to a call for additional capital. The trial court held in favor of the defendants on this issue and the limited partners appeal.

There are several questions on appeal. The first point raised by the plaintiffs questions whether they, as limited partners, are obligated to respond to the general partner's April 1991 call for additional capital under the terms of the limited partnership agree-

ment. With regard to that point, the limited partners raise the following issues: (1) whether the term "operating deficits" in the limited partnership agreement covers defendant Kay's personal loans to the partnership, and thereby obligated the limited partners to respond to Kay's capital call of April 25, 1991; (2) whether, under the limited partnership agreement, the call must be made in the year in which the partnership actually incurs the operating deficits; (3) whether the limited partnership agreement requires that the general partner attempt to obtain acceptable financing prior to making a call for additional capital; and (4) whether, under the limited partnership agreement, the only relief the partnership has against limited partners who breach a contractual obligation is to reduce the limited partners' interest in the partnership, and not to recover money damages.

The defendants' appeal questions whether the partnership is obligated to reimburse the limited partners for the sums that they paid to the bank as guarantors of Kay's loan from the bank, and if so, whether the defendants are entitled to a set-off for the amount that the limited partners received in a prior settlement with the bank. We hold that the limited partners are obligated to respond to the April 1991 capital call, that the limited partners are entitled to reimbursement for monies that they paid as guarantors of the general partner, who was the primary obligor to the bank and that the defendants are not entitled to a set-off for the amount the limited partners received in a previous settlement. Therefore, we affirm the trial court's decision.

There are no disputed facts, and most of the facts were stipulated to by the parties. Plaza West Associates was a Missouri limited partnership formed in 1983 under the Missouri Uniform Limited Partnership Act. The partnership was formed in order to purchase a 20–unit apartment building located in the Country Club Plaza area of Kansas City. Fred C. Kay was the general partner, having a five percent interest in the partnership. Kay was also a limited partner in the partnership, his interest being 14.25 percent.

The partnership was designed to take advantage of then existing tax laws. Potential

investors were invited to participate in the partnership through a confidential private placement memorandum. Interested investors would then purchase limited partnership units in the partnership, at $9800 per unit, by executing a limited partner subscription agreement. At subscription, each limited partner would deliver a check for the cost of their partnership interest, execute a promissory note for the balance of the purchase, and provide an executed signature page and participation agreement. After the partnership began its operation, each limited partner satisfied this promissory note with payment in full. The signature page operated as the limited partner's execution of the limited partnership agreement, and acknowledged the limited partner's agreement to be bound by all of the terms and conditions set forth in the agreement. Each limited partner made several representations and warranties, including that the limited partner had received, read and was familiar with both documents. Each limited partner warranted in the subscription agreement that they recognized the risks of investment in the partnership and had taken full cognizance of all of the risk factors related to the purchase of a partnership unit. The subscription agreement also reflected each limited partner's acceptance of the terms and conditions of the limited partnership agreement. Paragraph 9 of the agreement states:

*Additional Capital Contributions.* In any year in which the Partnership incurs operating deficits, and funds for the payment thereof are not available and cannot be borrowed on terms acceptable to the General Partner, then each partner, general or limited, shall be required to contribute his proportionate share of such deficit as an additional capital contribution (determined in accordance with the percentages then in effect for the division of profits and losses provided in Paragraph 8 hereof, as subsequently modified by any other provisions in this Agreement) in an amount not to exceed his proportionate share of the excess of operating expenses and mortgage payments over gross revenues from the property. In the event any partner fails to make any such required contribution within thirty (30) days following the receipt of written notice of the requirement to make such a contribution, such partner shall be deemed in default and the remaining Limited Partners shall have the right to make such additional capital contribution pro rata and thereby increase their percentage interests in the capital of the Partnership. In the event all Limited Partners have declined to provide all or any portion of such additional capital, then notwithstanding anything to the contrary herein contained, the General Partner is authorized to admit additional Limited Partners as necessary to raise the additional capital, and the percentage interests in the capital and profits and losses of the Partnership shall be adjusted to reflect such additional cash capital contributions of the existing Partners and the admission and cash capital contributions of any Limited Partners to be added.

Paragraph 10 of the limited partnership agreement states:

*Default in Making Capital Contribution.* Any Limited Partner who fails to make a capital contribution to the Partnership in the amount and at the time called for in the promissory note signed by such Limited Partner and in this Limited Partnership Agreement shall be in default. The Limited Partner shall be notified of the default by the General Partner and shall be given five days in which to make the required capital contribution to the Partnership and cure the default. In the event the Limited Partner fails to make the required capital contribution to the Partnership within the five day period:

(a) The General Partner shall notify, in writing, the remaining Limited Partners of any default no later than 20 days following the date upon which the defaulted Limited Partner's payment was originally due.

(b) Any Limited Partner, other than the defaulted Limited Partner may, within 10 days thereafter, purchase the Limited Partnership interest of the defaulted Limited Partner by notifying the General Partner and by making payment;

(1) To the defaulted Limited Partner, an amount equal to 50% of such defaulted Partner's then capital, and

(2) To the Partnership, the amount of the capital contribution required upon which the defaulting Limited Partner defaulted.

(c) Should more than one Limited Partner notify the General Partner of an intention to purchase the Limited Partnership interest of the defaulting Limited Partner, then each such Limited Partner desiring to purchase the defaulted Limited Partner's interest may purchase his pro rata portion according to such purchasing Limited Partner's then Percentage Share of Capital. The purchase shall be made in accordance with the provisions of subparagraph (b) above.

(d) If no Limited Partner desires to purchase the Limited Partnership interest of the defaulted Limited Partner, the General Partner shall arrange for a private sale of such interest. The defaulted Limited Partner shall receive from the proceeds of the sale the sale amount (but in any case not an amount which exceeds the book value of his capital on the date of sale of his interest) less any expenses incurred by the Partnership in connection with the sale. The Partnership shall receive the remainder of the proceeds of the sale, if any.

The limited partnership agreement states that the total purchase price was computed by multiplying the per unit price by the number of units purchased. On July 15, 1983, the partnership was formed. The partnership consisted of the following limited partners: Leslie M. Burns, Glenda Hainen, Elvin Knight, Susan Carpenter, Paula Virden, Ruth Spicer, Oscar Brewer, Steve Maerz and Fred C. Kay.[1] Their percentage interest in the partnership, and their total purchase price was:

| | | |
|---|---|---|
| Glenda Hainen | 19.00% | $19,600 |
| Leslie Burns | 14.25% | $14,700 |
| Paula Virden | 9.50% | $ 9,800 |
| Susan Carpenter | 9.50% | $ 9,800 |
| Judith Knight | 4.75% | $ 4,900 |

The partnership, through the general partner, obtained a first mortgage loan which was without recourse to the partnership and which was secured by a first deed of trust on the apartment building. The partnership, through its general partner, Kay, also obtained a loan for $162,500 from Southgate Bank secured by a second deed of trust on the apartment building. The bank loan was also secured by the personal guarantees of the limited partners and the general partner. Each guarantee was limited by the partner's percentage interest in the partnership. Fred Kay signed the bank loan as the general partner of the partnership.

On February 16, 1985, Kay, on behalf of the partnership, made a capital call from the limited partners for additional funds. Each of the partnership's limited partners remitted their pro rata share of the requested funds. On November 7, 1986, on behalf of the partnership, Kay made a capital call from the limited partners for additional funds. Each of the limited partners, except Burns, remitted their pro rata share of the requested funds. On December 21, 1988, the apartment building project was foreclosed on by the first deed holder. Paragraph 21 of the limited partnership agreement states:

*Termination.* In addition to any other causes stated herein, the Partnership shall terminate and shall be dissolved upon the transfer of all of the Partnership property other than to an entity of which the Partnership is a party or part owner.

In December 1988, the Southgate Bank loan was declared in default. The bank made written demand on Kay, as general partner, and on each of the limited partners in the partnership for payment of their guaranteed share of the note. The plaintiffs claim that they are entitled to reimbursement for the amounts they paid to the bank. The amounts they paid to the bank are:

| | |
|---|---|
| Ruth Spicer | $ 7,932.78 |
| Susan Carpenter | $15,831.34 |
| Leslie Burns | $23,747.01 |
| Paula Virden | $15,831.34 |
| Glenda Hainen | $30,934.14 |
| **TOTAL** | $94,276.61 |

On or about January 5, 1989, Southgate Bank initiated a lawsuit against Kay, in his capacity as general partner, for the unpaid balance of the bank's loan of $158,407.11, and took a default judgment against Kay in that

---

**1.** The plaintiffs in this litigation are some but not all of the limited partners of the partnership.

amount on January 27, 1989. The limited partners were not a party to this lawsuit.

On or about February 13, 1989, counsel for the bank advised Kay that all of the other limited partners in the partnership had paid the bank the amounts demanded of them by the bank on their personal guarantees. Counsel for the bank further instructed Kay that his share of $32,314.41, remained unpaid. This amount reflected Kay's pro rata share as a limited partner and his five percent interest as a general partner. On or about February 17, 1989, Kay tendered a cashier's check in the amount of $32,411.65 to the bank in exchange for the return of his guaranty agreement and the filing of a satisfaction of judgment. Kay instructed the bank that it could not negotiate the check unless it filed a satisfaction of judgment. On February 22, 1989, the bank filed a satisfaction of judgment in Johnson County, Kansas, which reflected all sums received by it from each of the partners in the partnership toward payment of the loan. The bank also filed a satisfaction of judgment in Jackson County, Missouri, where it had registered the judgment.

On December 5, 1989, Kay, on behalf of the partnership, demanded additional funds from the limited partners by making a call for additional capital contribution. None of the partnership's limited partners remitted their share of the requested funds.

On August 21, 1990, certain limited partners filed a lawsuit against the bank styled: *Leslie Burns, Paula Virden, Elvin Knight and Ruth Spicer v. Southgate Bank,* Case No. 90 C 9502, in the district court of Johnson County, Kansas. In this suit, the limited partners claimed that in connection with the payment of their guarantees, they were to receive from the bank an assignment of the bank loan, an assignment of the deed of trust, and an assignment of the judgment against Kay. They further claimed that by satisfying the judgment, the bank had defrauded the limited partners and/or had otherwise breached contractual obligations due them. Kay was not a party to this lawsuit.

The limited partners settled their dispute with the bank for $60,000. This settlement was allocated among the settling limited partners. For purposes of this lawsuit, the limited partners, who are plaintiffs involved in this litigation, received the following amounts in their settlement with the bank:

| | Before Attys' Fees | After Attys' Fees & Expenses |
|---|---|---|
| Leslie Burns | $14,400 | $6,923.07 |
| Glenda Hainen | $18,600 | $9,230.77 |
| Judith Knight | $ 4,800 | $2,307.70 |
| Susan Carpenter | $ 9,000 | $4,615.38 |
| Paula Virden | $ 9,000 | $4,615.38 |

On April 25, 1991, Kay, on behalf of the partnership, again attempted to solicit additional funds from the limited partners by making another call for capital contribution. The limited partners, who are plaintiffs in this lawsuit, did not make, and have not made, payment of the funds requested of them by the April 1991 call. The amount unpaid by each limited partner in this lawsuit is:

| | |
|---|---|
| Leslie Burns [2] | $27,038.53 |
| Susan Carpenter | $ 8,982.90 |
| Judith Knight [3] | $ 4,491.45 |
| Paula Virden | $ 8,982.90 |

The above referenced limited partners initiated this lawsuit against Kay on January 18, 1994. The partnership was joined as an additional defendant on February 6, 1995. No part of the $94,276.61 paid by the limited partners as guarantors of the promissory note, has been repaid by either the partnership or by Kay.

▮▮▮ The factual issues are either stipulated to by the parties or are not the subject of conflicting evidence, thus, on review, the *Murphy v. Carron,* standard applies. 536 S.W.2d 30, 32 (Mo. banc 1976). Where the issues do not concern the sufficiency of the evidence, the appellate court is not bound and need not defer to the trial court's conclusions as to the legal effect of its findings of fact. *Schroeder v. Horack,* 592 S.W.2d 742, 744 (Mo. banc 1979). Moreover, where the facts are derived from the pleadings, stipula-

---

2. Before this lawsuit was filed, Burns took an assignment of Hainen's interest in the partnership.

3. Knight is serving as personal representative for Ruth Spicer.

tions, exhibits and depositions, no deference is due to the trial court's judgment. *MFA Mut. Ins. Co. v. Home Mut. Ins. Co.,* 629 S.W.2d 447, 450 (Mo.App.1981). The appellate court will make its own independent evaluation of the trial court's declaration and application of the law. *Marshall v. Pyramid Dev. Corp.,* 855 S.W.2d 403, 406 (Mo.App. 1993).

■ The limited partners first dispute whether they are obligated to honor the general partner's April 1991 call for additional capital pursuant to the terms of the partnership's limited partnership agreement. Specifically, they challenge the meaning of "operating deficits." Paragraph 9 of the limited partnership agreement sets forth the conditions that a general partner has to meet before initiating a call for additional capital contribution. Paragraph 9 reads in relevant part:

> ***Additional Capital Contributions. In any year*** in which the Partnership incurs ***operating deficits,*** and funds for the payment thereof are not available and cannot be borrowed on ***terms acceptable to the General Partner,*** then each partner, general or limited, shall be required to contribute his proportionate share of such deficit as an additional capital contribution. . . .

(emphasis added). Paragraph 9 further provides that each limited partner's additional capital contribution shall not exceed the partner's proportionate share of the excess of "operating expenses and mortgage payments over gross revenues from the property."

The limited partners acknowledge that under certain circumstances the partnership may call upon them to make additional capital contributions. However, they maintain

that the parties did not intend for the phrase "operating deficits" contained in paragraph 9 to include loans made by the general partner to the partnership to fund the partnership's negative cash flow. The limited partners contend that the term "operating deficits" is plain and unambiguous and, therefore, urge the court to look solely at the express terms of the contract in interpreting its meaning. The limited partners refer us to *City of Fulton v. Central Elec. Power Coop.,* for the proposition that before extrinsic evidence can be used to show the correct meaning of a term, the contract must first be shown to be ambiguous. 810 S.W.2d 349, 351 (Mo.App. 1991).

In response, the partnership claims that the phrase "operating deficits" should be broadly defined to include loans made by the general partner to the partnership. The partnership contends that this interpretation of the phrase "operating deficits" is supported by the limited partners' prior conduct[4] and the partnership's private placement memorandum.[5] In support of this argument, the partnership relies upon *Butler v. Mitchell–Hugeback, Inc.,* 895 S.W.2d 15 (Mo. banc 1995). In *Butler,* the court stated:

> The cardinal principal for contract interpretation is to ascertain the intention of the parties and to give effect to that intent . . . in order to determine the intent of the parties, it is often necessary to consider not only the contract between the parties, but the subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other

---

4. The partnership maintains that the same limited partners who now object to the April 1991 capital call, honored two prior calls for additional capital, both of which notified the limited partners that the additional capital was necessary to repay loans previously advanced to the partnership by the general partner and a company owned by the general partner, Matrix Realty.

5. The partnership maintains that the private placement memorandum expressly warned the limited partners of their responsibility to contribute additional capital. Specifically, the private

placement memorandum provide that "the projections of the general partner as to the cash flow may prove incorrect as a result of income being less than projected or expenses being more than projected, or for other reasons. In such event, negative cash flow in excess of the projections could result and each limited partner would be required to contribute his proportionate share of such deficit as additional capital contributions. See Paragraph 9 of the Limited Partnership Agreement."

external circumstances that cast light on intent of the parties.

*Id.* at 21 (citing *Royal Banks of Mo. v. Fridkin,* 819 S.W.2d 359 (Mo. banc 1991)).[6]

▮ Generally, courts look to the intention of the parties to interpret a contract. *Marshall v. Pyramid Dev. Corp.,* 855 S.W.2d 403, 406 (Mo.App.1993). If the contract is not ambiguous, the intention of the parties should be determined from the contract alone. *Central Elec. Power Coop.,* 810 S.W.2d at 351; *Slankard v. Thomas,* 912 S.W.2d 619, 624 (Mo.App.1995). A contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable men may fairly and honestly differ in their construction of the terms. *Union Ctr. Redev. Corp. v. Leslie,* 733 S.W.2d 6, 9 (Mo.App. 1987). To determine whether a contract is ambiguous, words should be given their natural and ordinary meaning. *J.E. Hathman, Inc. v. Sigma Alpha Epsilon,* 491 S.W.2d 261, 264 (Mo. banc 1973).

We conclude that the term "operating deficits" is not ambiguous, although in the present case, it is not defined. "Deficits" is commonly defined as a loss in business operations. *See* WEBSTER'S NEW COLLEGIATE DICTIONARY 216 (7th Ed.1971). This definition is clear, intelligible and not susceptible to various interpretations. Thus, it is not necessary for us to look beyond the express terms of the agreement to determine the parties' intent. *See Hathman,* 491 S.W.2d at 264 (finding that a contract is not ambiguous merely because the parties disagree over its meaning); *Young Dental Mfg. Co. v. Eng'd Prods., Inc.,* 838 S.W.2d 154, 156 (Mo.App.1992)(stating that if a meaning is common enough "a court should not indulge in the vagaries of the legal mind to seek an uncommon meaning").

In the instant case, the general partner made certain loans to the partnership to cover earlier obligations incurred by the partnership. When the obligations were first experienced, the general partner believed that he could borrow money to cover the deficits and, therefore advanced the money. The partnership was not, however, able to borrow money to cover its obligations, thus a call for additional capital contribution was made. The limited partners concede that the deficit leading to the loans would have been eligible for a call for additional capital. However, because the general partner is seeking reimbursement for loans that he made to the partnership to cover its operating deficits, the limited partners claim that the call for additional capital is not authorized. In support of this argument, the limited partners refer us to a bankruptcy case where the court narrowly interpreted the term "operating deficits." *See In Re Villa West Associates,* 151 B.R. 265 (1993).[7]

*Villa West* involved a limited partnership that purchased the Villa West Shopping Center in Topeka, Kansas, by obtaining two notes. *Id.* at 270. The limited partners signed as guarantors on both of the notes. The partnership suffered operating deficits throughout its existence and eventually filed for protection under Chapter 11 of the Bankruptcy Code. Soon thereafter, the partnership's two notes matured and became due. The general partner made two different calls for additional capital, but they were not honored. Consequently, the general partner brought a third party proceeding against the limited partners for breach of their obligation to make additional capital contributions. Based on these facts, the court ruled that the limited partners were obligated to make additional capital contributions to the partnership. In reaching this conclusion, the court determined that the term "operating deficits" contained in the limited partnership agreement did not include loans made by the general partner to the partnership. *Id.* at 273–74.

We believe that the *Villa West's* court's interpretation of operating deficits is too restrictive. The clear intent of paragraph 9 allows the partnership, if it experiences operating deficits, to call for additional capital contribution, whether the capital was intend-

---

6. In *Butler,* the court determined that the agreement in question was ambiguous prior to examining extrinsic evidence. *Butler,* 895 S.W.2d at 20.

7. Fred Kay was also the general partner in Villa West.

ed to fund the partnership or reimburse the general partner. Like the limited partnership agreement, the private placement memorandum equates any negative cash flow, regardless of the cause or source, with the partnership's right to make a call for additional capital contribution. Similarly, the partnership's cash flow projections incorporate all partnership obligations, including operating expenses and principal and interest payments due on loans to the partnership. In short, the limited partners' argument that only certain partnership obligations can be included in calculating operating deficits is erroneous in that it is not compatible with the tone of the limited partnership agreement and the specific understanding of the parties. *Sanders v. Wallace*, 884 S.W.2d 300, 303 (Mo.App.1994). The term "operating deficits" is inclusive and does not distinguish between the different types of deficits.

Moreover, the limited partners' narrow definition of operating deficits ignores the tax driven nature of real estate syndications, such as this partnership, which were designed to take advantage of existing tax laws by maximizing partnership obligations which could be utilized to create loss pass throughs to the partners. To do this the limited partners must have been at risk. In essence, the limited partner is obligated, under the partnership agreement, to respond to a call for additional capital contribution to the partnership. *Gefen v. Commissioner*, 87 T.C. 1471, 1499–1501, 1986 WL 22070 (1986). The private placement memorandum expressly advised the limited partners of their need to be *at risk* for the partnership obligations as a condition for them to take advantage of the tax benefits of the loss pass throughs. Thus, the limited partners agreed to limit the general partner's exposure to secure desirable tax benefits.

■ The limited partners next contend that the phrase "in any year" dictates that a demand for additional capital must be made in the year in which said operating deficit was incurred. The April 1991 capital call was meant to cover obligations that the partnership incurred in 1987, 1988 and 1989, thus, the limited partners contend that the call was not timely under the "in any year"

requirement of paragraph 9. They maintain that the language contained in paragraph 9 is plain and unambiguous, in that it does not say *for any year* or *after any year*.

We agree with the partnership's argument that "in any year" means the time frame within which to measure the partnership's operating deficits. Specifically, the partnership argues that a narrow interpretation of the phrase "in any year"—as requiring that capital calls be made within the same calendar year in which an operating deficit was incurred—would lead to unreasonable and unintended results. For example, if the partnership could not determine until the end of December whether it had an operating deficit for that year, the general partner would be unable to make a call for additional capital contribution regarding that deficit.

However, since we also agree that "in any year" can reasonably be construed to be consistent with the limited partners' interpretation, Missouri case law dictates that we look beyond the four corners of the contract to determine the parties' intent. *See Rodriguez v. General Accident Ins. Co. of Am.*, 808 S.W.2d 379, 382 (Mo. banc 1991)(explaining that "ambiguity arises when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract"). *See also Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. banc 1995).

The parties' prior conduct compels the conclusion that the phrase "in any year" was intended to mean that if the partnership experiences operating deficits during a certain year, calls for additional capital contribution to fund those deficits can be made within a reasonable period thereafter. Specifically, in its February 1985 call for additional capital contribution, the partnership expressly indicated that the call was designed to encompass an operating deficit generated in 1984, the *year before* the call was made. Similarly, the partnership's November 1986 call for additional capital contribution indicated that the call was intended to repay loans advanced to the partnership in November 1985, April 1986, and May 1986, obligations which were partially incurred in the *year before* the call was made. In both cases, the limited partners made the additional capital

contribution without objection. *See Radford v. Radford,* 388 S.W.2d 33, 38 (Mo.1965)(stating that the construction that the parties place on their contract, as evidenced by their acts and conduct, is strong evidence of their real intent).

The tax driven nature of the limited partnership agreement also warrants the conclusion that the phrase "in any year" was meant to be broadly construed. *See Wilshire Const. Co. v. Union Elec. Co.,* 463 S.W.2d 903, 906 (Mo. banc 1971)(recognizing that in determining the parties' intent, the courts should consider the object, nature, and purpose of the contract). Here, the limited partners knowingly entered into the limited partnership agreement and decided to become contractually obligated to make additional capital contributions in order to receive profitable tax benefits. The purpose of the additional capital contribution requirement was to make each limited partner *at risk* for their share of the partnership's operating deficits, in order for them to be eligible for the associated tax benefits. Just because the additional capital contribution requirement has proven to be disadvantageous to the limited partners, they cannot now change the terms of the contract. *Alack v. Vic Tanny Int'l of Mo., Inc.,* 923 S.W.2d 330, 334 (Mo. banc 1996)(noting that it is a long established rule in Missouri that a party who voluntarily enters into a contract is bound by its terms, even though the contract may prove disadvantageous).

Having reviewed both the external circumstances surrounding the agreement and the plain language of the agreement itself, we conclude that the parties intended for the term "in any year" to be broadly construed as a time reference within which to measure the partnership's operating deficits, and was not meant to place a limitation upon the time in which a capital call may be made.

■ Next, the limited partners contend that before soliciting additional capital, the general partner must determine that he is not able to borrow funds on terms acceptable to the general partner. The limited partners point to the requirement in paragraph 9 that capital calls be made only when funds "cannot be borrowed on terms acceptable to the general partner." The limited partners argue that Matrix Realty, a company owned by Kay, had previously loaned money to the partnership thus, there is no reason to believe that Kay could not have obtained additional financing from Matrix Realty.

There was no evidence presented to support the limited partners' position that Kay could have borrowed funds from any source, including his company, Matrix Realty. Other than Matrix Realty's previous loans, the limited partners presented no evidence that the partnership was able to borrow funds to satisfy the operating deficits acceptable to the general partner, or that Matrix Realty was willing to lend the partnership money. By the express terms of paragraph 9, it is anticipated that there may be instances when the limited partnership will not be able to borrow funds from another source on terms and conditions acceptable to the general partner. Clearly, those instances were meant to encompass a situation, like in the present case, where the partnership is winding down its affairs and is unable to secure financing from any source.

■ Finally, the limited partners argue that the sole remedy that the partnership has against limited partners who refuse to respond to a capital call is to reduce the limited partners' interest in the partnership, not to sue them for damages. Here, the partnership action is for money damages in the form of additional capital.

This court has previously held that a contract provision which authorizes a limited partnership to make capital calls from its limited partners is enforceable, and that a limited partner who breaches such an obligation will be subject to a breach of contract suit. *Coventry Manor Phase II Associates, L.P. v. Bernard A. Hainen,* 904 S.W.2d 279, 283 (Mo.App.1995). In *Coventry Manor,* the court addressed the enforceability of an additional capital contribution provision in a limited partnership agreement under circumstances similar to those found in the present case. In fact, the additional capital contribution provision in *Coventry Manor* was almost identical to the additional capital contribution provision contained in Paragraph 9 of this

limited partnership agreement. *Id.* at 280–81. In *Coventry Manor*, the court concluded that the limited partnership agreement in question contractually obligated the limited partners to make additional capital contributions to the partnership. In reaching this conclusion, the court in *Coventry Manor* held that the additional capital contribution provision did not set forth an "exclusive remedy to the Partnership for breach by a partner of an obligation to contribute capital." *Id.* at 282–83. Therefore, the partnership was entitled to recover money damages from a defaulting limited partner. *Id.*[8]

The court's reasoning expressed in *Coventry Manor* is applicable to the current case. Hence, we conclude that paragraph 9 of the limited partnership agreement merely provides the partnership with the option to reduce the defaulting partner's interest; it does not provide an exclusive remedy to the partnership for a breach by the limited partners of their obligation to contribute additional capital.

In sum, our review of the limited partners' arguments reveals that the term "operating deficits" is unambiguous and should be read to include loans made by the general partner to the partnership to cover its negative cash flow; that the partnership is not limited in its ability to make a call for an additional capital contribution to the year in which said operating deficit was incurred; that the express terms of the limited partnership agreement implies that there will be occasions when the general partner is unable to borrow funds and will be required to make a call for an additional capital contribution; that the partnership is entitled to make a call for an additional capital contribution even after it has dissolved; and that the partnership is not limited to the remedy explicitly listed in the limited partnership agreement. For these reasons, the trial court did not err in determining that the limited partners were

contractually obligated to respond to the April 1991 call for additional capital. Point denied.

█ On the cross-appeal, the partnership contends that the limited partners are not entitled to reimbursement for sums that they paid to the bank as guarantors. The partnership had obtained a loan from the bank in the amount of $162,500. Kay was the principal obligor, and the note was guaranteed by the limited partners in the amount of their pro rata share of the partnership. Thereafter, the loan was declared in default, and the limited partners were forced to discharge the note in the amount of $94,276.61. Subsequently, Kay paid the bank his respective shares as a limited and general partner and the note was released. The trial court found in favor of the limited partners on their claim for reimbursement for monies that they paid as guarantors on the debt.

The partnership maintains that there is an inherent inconsistency in the trial court's decision in favor of the limited partners on their claim for reimbursement for amounts paid to a partnership on the one hand, and its ruling in favor of the partnership on their counterclaim to enforce the general partner's April 1991 call for additional capital on the other hand. The partnership maintains that the capital contribution provision found in paragraph 9 of the limited partnership agreement served to waive the limited partners' right to reimbursement for the bank loan.

█ Reimbursement is a common law principle which recognizes that a guarantor has an implied right to be reimbursed by the principal if the guarantor pays the principal's debt. *In re Jamison's Estate*, 202 S.W.2d 879, 883 (Mo.1947). It is a well established rule that when a guarantor enters into a guaranty contract at the request of the principal obligor, the principal impliedly promises to reimburse the guarantor for the amount he pays for the obligation. 38 C.J.S. *Guar-*

---

**8.** The limited partners attempt to distinguish Coventry Manor on the following grounds: (1) the partnership was fully operational and had not dissolved or gone bankrupt; (2) the request for additional capital was not to repay old debts of the partnership but to pay off ongoing operating deficits; (3) the debts owed by the partnership were not primarily to the general partner

himself; and (4) the limited partner had no case support for his contention that remedies available to the general partner must be specified in the agreement, while the court relied upon a single Louisiana case. These are the same arguments that we discussed *supra*, and concluded that they have no merit.

*anty* § 111 (1943). *See also Gibson v. Harl,* 857 S.W.2d 260, 268 (Mo.App.1993)(stating "[w]here a guarantor pays the debt of the principal debtor the law implies a promise of reimbursement, and the action is based upon equitable principles"). The partnership does not dispute that the limited partners, as guarantors, have an implied right of reimbursement against the partnership for the amount that they paid to the bank. Furthermore, the partnership argues, and the limited partners do not contest, that reimbursement may be waived.[9] Thus, the dispositive issue here is whether the limited partners contractually waived this right of reimbursement by the provision in paragraph 9 in which they agreed to be obligated for additional capital contributions.

■ The partnership correctly points out that an obligation cannot be created by implication contrary to an express provision of the contract. *See Acetylene Gas Co. v. Oliver,* 939 S.W.2d 404, 409 (Mo.App.1996)(covenants will not be implied in contract for any matter that is covered by written terms of contract). The partnership's primary reliance is on *Gefen v. Commissioner,* 87 T.C. 1471, 1986 WL 22070 (1986), in which the court held that a limited partner could not be reimbursed for monies paid out on a guarantee. *Id.* at 1504. In *Gefen,* the court ruled that a limited partner who is obligated to contribute additional capital to the partnership has no right to reimbursement from either the partnership or the general partner for amounts paid to a partnership creditor directly. The *Gefen* court reasoned that the limited partner was not a mere guarantor of a pro rata share of the partnership's debt, but was ultimately liable for the debt. *Id.* at 1501–04.

In *Gefen,* however, the limited partnership agreement expressly stated that the limited partner had no right to reimbursement from either the partnership or the general partners for amounts paid. *Id.* at 1475. Specifically, the limited partnership agreement provided:

> [T]he undersigned assumes personal liability for repayment of a portion of the Recourse Amount as follows ... the undersigned hereby unconditionally guarantees to the Lender, its successors and assigns, the due and prompt collection, in accordance with the terms thereof, of up to $101,764 of the Recourse Amount.... The obligations of the undersigned to make additional capital contributions shall not in any way derogate from the right of the Lender to proceed to enforce this Guarantee directly against the undersigned without first proceeding against the Partnership.

*Id.*

In the present case, the mechanism by which the limited partners could have waived their right to reimbursement is paragraph 9 of the limited partnership agreement, which falls far short of the provision in *Gefen.* In *Acetylene Gas Co. v. Oliver,* the court determined that to rise to the level of a waiver, the conduct "must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of the conduct is possible." 939 S.W.2d at 409 (quoting *Waterwiese v. KBA Constr. Managers,* 820 S.W.2d 579, 585 (Mo.App.1991)). *See also Howe v. Lever Bros. Co.,* 851 S.W.2d 769, 775 (Mo.App.1993)(stating that a waiver is the intentional relinquishment of a known right). As observed, paragraph 9 lacks the specificity required to contractually waive the limited partners' right to reimbursement from the general partner as the primary obligor. In the absence of additional contract provisions comparable to the provisions present in *Ge-*

---

9. *Alack,* 923 S.W.2d at 335 (Mo. banc 1996)(acknowledging that a party may contractually waive the right to bring an action for personal injuries sustained as a result of future negligent acts); *High Life Sales Co. v. Brown–Forman Corp.,* 823 S.W.2d 493, 496 (Mo. banc 1992)(holding that the importance of the freedom of contract between parties overrides any public policy interest in guaranteeing Missouri residents a right of access to Missouri courts); *McCarney v. Nearing,* 866 S.W.2d 881, 887–90 (Mo.App.1993)(noting that by agreeing to arbitrate, parties are contractually agreeing to relinquish substantial rights such as the right to jury trial and/or their right to present their claim to any judicial tribunal); and *Malan Realty Investors, Inc. v. Bea Harris,* 953 S.W.2d 624, 627 (Mo. banc 1997)(enforcing a contractual agreement to waive the right to jury trial). None of the cases cited above are factually similar to the case before us.

*fen*, the limited partners' right to reimbursement remains intact. Point denied.

 The partnership's final argument questions whether the trial court erred in failing to reduce that part of the judgment in favor of the plaintiffs for reimbursement of amounts paid to the bank as guarantors by the amount of money that the limited partners received from the bank as a result of a prior settlement. The partnership refers us to *Watson v. Harris* for the proposition that a court of equity has the inherent power, as a part of its general jurisdiction, to allow or compel a set-off. 435 S.W.2d 667, 675 (Mo. 1968). In *Watson*, the court determined that defendants in a fraudulent conveyance suit were entitled to a credit for time and money spent on the property in question, otherwise, "the result would be an unjust enrichment, a windfall, to plaintiff." *Id.* at 676.

The limited partners claim that the partnership is not entitled to a set-off in that there was no mutual indebtedness. *Gibson v. Harl*, 857 S.W.2d 260, 270 (Mo.App.1993). In *Gibson*, the court determined that the set-off doctrine is founded upon mutual indebtedness and that the demands in the two suits must be due between the same parties in the same capacity. *Id. See also Payne v. Payne*, 695 S.W.2d 494, 496 (Mo.App.1985)(holding that in order for a party to be entitled to set-off, they not only must be the same party, but also must be due set-off in the same capacity or right).

Here, the bank loan was declared in default and the bank thereafter made written demand on Kay, as general partner, and on each of the limited partners as guarantors. The limited partners responded to the bank's demand, however, Kay's pro rata share as a limited partner and his five percent interest as a general partner, remained unpaid. Kay subsequently tendered a cashier's check covering this amount to the bank in exchange for return of his guaranty agreement and the filing of a satisfaction of judgment. Kay instructed the bank that it could not negotiate the check unless it filed a satisfaction of judgment. The bank filed a satisfaction of judgment in Johnson County, Kansas, and Jackson County, Missouri. Upon the filing of the satisfaction of the judgment, some of the limited partners, other than Kay, filed a lawsuit against the bank. In this suit, the limited partners claimed that they were to have received an assignment of the judgment against Kay in exchange for the payment of their pro rata share. The limited partners claimed that the bank defrauded the limited partners and breached its contractual obligations by satisfying the judgment. Kay was not a party to the lawsuit. The limited partners settled their dispute with the bank for $60,000, which was allocated among the settling parties.

Because the evidence shows that the partnership was not a party to the previous settlement, and that there is no mutual indebtedness, the partnership is not entitled to a set-off. Neither Kay nor the partnership was a plaintiff or a defendant in the suit against the bank. Moreover, the cause of action in the two separate suits is different. Here, the limited partners are claiming that they are entitled to reimbursement for money they paid the bank as guarantors. With regard to the previous lawsuit, the limited partners claimed that the bank misrepresented and breached its agreement with the limited partners. Although both suits involved similar facts, the partnership is not entitled to set-off because there is no mutual indebtedness. Point denied.

Judgment affirmed.

ULRICH, P.J., and EDWIN H. SMITH, J., concur.