The **BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, Plaintiff,**

v.

**KANSAS CITY SOUTHERN RAILWAY COMPANY, Defendant.**

No. 98–2307–JWL.

United States District Court, D. Kansas.

Aug. 16, 1999.

William P. Coates, Jr., Holman, Hansen & Colville, P.C., Prairie Village, KS, for plaintiff.

James F. Duncan, Robert B. Best, Jr., Brian Edward Engel, Armstrong Teasdale LLP, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Burlington Northern and Santa Fe Railway Company ("BNSF") instituted this diversity action to recover damages arising from defendant Kansas City Southern Railway Company's ("KCS") alleged breach of the parties' contract. In its memorandum and order dated March 2, 1999, this court denied defendant KCS' motion for summary judgment, and entered summary judgment in favor of plaintiff BNSF, finding plaintiff entitled to damages in the amount of $751,845.46. Additionally, the court ordered the parties to file briefs on the issue of plaintiff's entitlement to prejudgment interest.

On May 12, 1999, the court granted plaintiff BNSF's motion for reconsideration, finding the parties' agreement ambiguous with respect to the amount of payment owed by defendant. A trial to the court was held on that limited issue on July 12, 1999. This Memorandum and Order constitutes the court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

After careful consideration of all of the evidence, as well as the arguments of counsel, the court finds in favor of defendant KCS on the contract interpretation issue. Additionally, the court has considered the parties' respective memoranda with respect to the issue of prejudgment interest, and finds plaintiff entitled to prejudgment

interest accruing from February 1, 1998 at a rate of nine percent per annum.

## I. Background

The following underlying facts of the parties' dispute are uncontroverted. In January 1991, BNSF's predecessor in interest, Burlington Northern Railroad Company, and KCS entered into a "run-through" or locomotive interchange contract, whereby both parties strove to "obtain maximum utilization of locomotive units." The purpose of this contract was to facilitate the parties' sharing of units of power, known as "horsepower hours" in the railroad industry, and, according to the contract, "to provide for the uniform settlement of such matters as are customarily related to the operation and run-through of locomotive units."

Section III of the parties' agreement governs "Locomotive Unit Equalization and Caboose Rental." Section 3.4 provides, in pertinent part:

> The parties agree that not less than every three (3) months and upon request of either of the parties to whom locomotive horsepower hours are owing, the party owing said locomotive horsepower hours shall promptly place in service hereunder an additional locomotive unit or units as may be agreed are necessary to overcome any such deficit within the subsequent three-month period. The party not having a horsepower hour deficit shall withdraw an appropriate number of locomotive units to permit the assignment of the agreed upon number of additional locomotive units by the party in deficit. In the event of the inability or failure of the owing party to so place in service sufficient additional locomotive units to overcome the horsepower hour deficit, the party to whom the horsepower hours are owed shall have the option of (1) receiving the horsepower hours in kind over an additional period of time as may be agreed upon by the Chief Operating/Transportation Officers of the parties hereto, or (2) receiving payment for any remaining unequalized horsepower hours at a rate to be calcu-

lated by applying the formula contained in the statements marked Exhibit "A," attached hereto and made a part hereof, to the appropriate accounts of [Burlington Northern] or KCS, as the case may be, for the latest calendar year for which annual figures are available. In the event of termination of this Agreement, settlement for any unequalized horsepower hours shall be paid for at the above mentioned rate....

In the latter months of 1997, KCS began to accumulate a horsepower hour deficit, and on October 31, 1997, KCS owed BNSF 43,459,275 horsepower hours. On November 5, 1997, BNSF issued written notice to KCS regarding KCS' then-existing deficit. On January 31, 1998, at the end of the ninety-day period within which KCS was to settle its horsepower hours balance pursuant to the November 5, 1997 notice, the number of horsepower hours owed by KCS to BNSF totaled 135,854,985. At that time, plaintiff chose to exercise its option to demand cash payment for the remaining unequalized horsepower hours, and presented defendant a demand for the cash equivalent of 135,854,985 horsepower hours. Defendant refused to remit the requested payment to plaintiff, and this lawsuit ensued. At no time did plaintiff issue an additional notice for the supplemental deficit accumulated by defendant during the cure period.

In its summary judgment papers, plaintiff argued that pursuant to its option to demand cash payment for any deficit remaining at the end of the three-month cure period, plaintiff was entitled to cash payment for the entire balance then outstanding as of January 31, 1998, or 135,-854,985 hours, rather than the outstanding balance of 43,459,275 hours for which notice was originally issued on November 5, 1997. In its response, defendant claimed that if plaintiff was entitled to cash payment for any horsepower hours at all, the amount of plaintiff's recovery was limited to the original deficit of 43,459,275, the

number of hours for which BNSF issued the November 5, 1997 deficit notice.

At the summary judgment stage, the court found that only one meaning of the term "remaining" was possible, i.e., that which related back to the previous clauses contained in that portion of the contract, such that the option to "receiv[e] payment for any remaining unequalized horsepower hours" necessarily described the hours for which the original notice was issued. Thus, although the court granted summary judgment in favor of plaintiff BNSF, BNSF's contractual damages were limited by the court to the cash equivalent of 43,459,275 horsepower hours.

Upon review of plaintiff's motion to reconsider, however, the court found that it had not fully apprehended plaintiff's argument that "any remaining unequalized horsepower hours" required payment of *any* hours owing at the time of the demand for payment and, as a result, the court granted the motion to reconsider. As noted by the court at that time, the words "remaining" and "unequalized," when read in conjunction, caused the court to conclude that it was at least as plausible that the term "unequalized" provided context to the term "remaining," such that plaintiff's construction that, once the ninety-day cure period elapsed, the cash equivalent for any hours then owing, as opposed to merely those for which notice was issued, was to be paid in full by the owing party. Thus, on May 12, 1999, the court granted plaintiff's motion for reconsideration, finding that, according the contract terms their plain and ordinary meaning, both KCS and BNSF had presented reasonable interpretations of the contract's "any remaining unequalized horsepower hours" language.

In light of its conclusion that the contract's terms are legally ambiguous, the court determined that the parties were entitled to a trial to put on evidence in order to resolve any fact questions bearing on the ambiguity. In this regard, the parties were specifically invited to present extrinsic evidence regarding the following matters: 1) the mutual intent of the parties with respect to the equalization clause, 2) any industry standards, practice, or custom relevant to the resolution of the parties' probable intent regarding the disputed terms, and 3) evidence with respect to the goals the parties hoped would be accomplished by the equalization portion of the contract.

## II. Findings of Fact

The parties having waived a jury, a trial to the court was held on July 12, 1999. At trial, it was established that the initial draft of the agreement was prepared by Jerry Kirby, a former contract manager for Burlington Northern. According to his testimony, Mr. Kirby was the only person who drafted the contract. Mr. Kirby testified that he procured section 3.4 of the parties' run-through agreement from a standardized form published by the Association of American Railroads ("AAR"). Although the parties apparently exchanged several drafts of the proposed agreement, according to the testimony presented at trial, no negotiations specific to the language set forth in section 3.4 occurred between the parties. Neither party presented preliminary drafts or correspondence relevant to the parties' intent regarding section 3.4 of the agreement. By all accounts, KCS took no exception to the language utilized in that portion of the contract.

The trial testimony established that, in the railroad industry, companies operating pursuant to run-through agreements rarely ever reach a continuous zero balance. Instead, horsepower hour deficits fluctuate from day to day, month to month, and year to year; thus, the status of each party to a run-through agreement often alternates between debtor (i.e., the party owing horsepower hours) and creditor (i.e., the party to whom horsepower hours are owed). When one party's deficit becomes exceptionally large, most railways merely informally discuss the situation with one another rather than issuing formal demand

notices. If informal discussions fail to remedy the situation, however, a creditor railroad will issue notice to the owing party, thereby invoking the type of deficit notice provision at issue in this case.

Although run-through agreements are fairly common in the industry, and despite the fact that deficit notices are sometimes issued under the terms of run-through contracts, none of the witnesses could recall an instance in which, once notice of a deficit was issued, the owing party increased, rather than decreased its horsepower hours balance. Moreover, no evidence was presented of any experience under the precise form of contract language present here. Thus, no evidence of industry standard or custom relevant to the dispute was presented by either party.

## III. Discussion and Conclusions of Law

### A. Contractual Ambiguity[1]

■ Under Missouri law,[2] "[t]he cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo.1995). If the terms of a contract are clear and unambiguous, "the intent of the parties is to be determined from the

contract alone and the courts will not resort to construction where the intent of the parties is expressed in clear and unambiguous language." *Mt. Hawley Ins. Co. v. Azia Contractors, Inc.*, 886 S.W.2d 640, 642 (Mo.Ct.App.1994). Contractual ambiguity arises "if the language, given its plain and ordinary meaning as understood by a reasonable person, is reasonably susceptible to more than one construction." *Jackson v. Christian Salvesen Holdings, Inc.*, 978 S.W.2d 377, 383 (Mo.Ct.App. 1998). As set forth above, the court granted plaintiff's motion to reconsider in light of its conclusion that the parties' contract is susceptible to two reasonable interpretations, and, therefore, ambiguous with respect to the term "any remaining unequalized horsepower hours."

■ After considering the evidence and the arguments presented at trial, the court concludes that neither party contemplated the course of events that occurred in this particular case, such that it is impossible to attempt to determine the meaning of the disputed terms from the parties' intent. Indeed, neither party came forward with any evidence regarding the parties' intent with respect to the precise meaning of "any remaining unequalized horsepower hours," because neither party ever antici-

---

1. During the course of trial, the court took under advisement several evidentiary objections made on behalf of both parties. The court concludes that it need not rule on these objections, however, because even if the court were to consider the objected-to evidence, that evidence would not change the outcome of this action. More specifically, because the court concludes that neither party anticipated the course of events that occurred in this case, and thus never attached a subjective meaning to the phrase "any remaining unequalized horsepower hours," the evidence presented at trial is immaterial to the issue of ambiguity, and thus non-dispositive of the court's holding here. Moreover, although there was some indication from the evidence presented at trial that the overall goal of the parties' agreement was to generally maintain an equalized balance, that does not shed any light on what the parties intended by the term "any remaining unequalized horsepower hours" in the event that a deficit was in-

creased, rather than decreased, during the period after a notice to cure a specific deficit was issued. An overall desire to maintain equilibrium is not inconsistent with providing notice and a stated time to cure a particular deficit (as defendant's interpretation does) and does not mandate a zeroing out requirement (as plaintiff's interpretation does).

2. The court notes that, as set forth in detail below, the parties disagree with respect to the choice of law on the issue of prejudgment interest. The parties' agreement contains a choice of law clause that specifically provides that Missouri law shall govern the terms of the contract. No choice of law issue arises in the context of resolving the contractual ambiguity at issue in this case, however, because the court is, in this section, construing the *terms* of the parties' contract, and thus its analysis is made in reference to Missouri law, as per the parties' choice of law provision and agreement of the parties.

pated that, once a notice to cure was issued, the owing party would increase, rather than decrease, the then-existing deficit. Nor was either party able to establish any facts tending to show the prevailing industry standard or custom in such a situation; in fact, it appears from the evidentiary record that no such custom or standard existed because those in the industry have never faced a factual scenario similar to that which occurred in the case at bar.

The court is thus faced with a situation in which the ambiguity cannot be resolved from a consideration of extrinsic evidence of the parties' intent with respect to the disputed clause because there is simply no such evidence on the record. Common sense dictates that contractual "[i]nterpretation cannot turn on meanings that the parties attached if they attached none...." E. ALLAN FARNSWORTH, CONTRACTS, § 7.9 at 510 (2d ed.1990). Where, as here, the parties' extrinsic evidence does not resolve the ambiguity, the court is left with "no choice but to look solely to a standard of reasonableness." *Id.* Thus, the court's interpretation "must turn on the meaning that reasonable persons in the positions of the parties would have attached if they had given the matter thought." *Id.; see also Southern Bell Tel. & Tel. Co. v. Florida East Coast Ry. Co.,* 399 F.2d 854, 856 (5th Cir.1968) ("It is axiomatic that the first task of a court in contract interpretation is determining from the agreement itself and the surrounding circumstances what the intent of the parties was. If, after examining all these sources of information, it is still not possible to determine the intent of the parties, courts can rely on rules of law which purport to determine what, in certain circumstances the parties intended, when, in fact, no one really knows what was intended"). Accordingly, in the absence of any evidence of the parties' actual intent regarding the meaning of "any remaining unequalized horsepower hours," the court is left to interpret the disputed phrase as best it can in light of the objective standard.

■ The court thus turns to the language of the contract itself in an attempt to accord its terms with the most objectively reasonable meaning. The first sentence of Section 3.4 specifically provides that

... not less than every three (3) months and upon request of either of the parties to whom locomotive horsepower hours are owing, the party owing *said locomotive horsepower hours* shall promptly place in service hereunder an additional locomotive unit or units as may .be agreed are necessary to overcome *any such deficit* within the subsequent three-month period.

From this sentence, the court concludes that the phrase "said locomotive horsepower hours" refers to those hours for which notice is issued, and that the use of the word "such" to modify the word "deficit" in defining the number of locomotives to be placed into service during the subsequent three-month period also refers to the balance for which notice was issued. Thus, to the extent that a three-month period was allowed to cure a deficit, the parameters of that deficit to be cured are defined by the number of hours for which the notice issued.

The next relevant portion of Section 3.4 provides:

In the event of the inability or failure of the owing party to so place in service sufficient additional locomotive units to overcome *the horsepower hour deficit,* the party to whom the horsepower hours are owed shall have the option of....

From this portion of Section 3.4, the court concludes that the parties' use of the word *"the"* to describe the event that will trigger the creditor party's options at the end of the three-month cure period, i.e., the owing party's failure to cure *"the* horsepower hour deficit," necessarily contemplates an owing party's failure to equalize the deficit for which notice was issued. Thus, the creditor party's options at the end of the three-month period, as explained in more detail below, are triggered by the owing

party's failure to overcome *the* deficit "noticed up" by the creditor party within three months after notice is issued.

Next, Section 3.4 describes the options available to the party to whom horsepower hours are still owed at the end of the three-month cure period. Specifically, the creditor party may elect to:

> (1) receiv[e] the horsepower hours in kind over an additional period of time as may be agreed upon by [the parties] or
> (2) receiv[e] payment for *any remaining unequalized horsepower hours . . . .*

As explained above, the court concludes that Section 3.4 charges the owing party with the responsibility to reduce, within three months, *the* deficit for which notice was originally issued. While this may be true, plaintiff argues that the owing party's responsibility once notice is issued is not only to cure *the* deficit for which notice was issued, but to reduce the balance to zero. Because plaintiff maintains that it is incumbent upon an owing party to reduce its balance to zero once notice is issued, plaintiff insists that the option to seek the cash equivalent of "any remaining unequalized horsepower hours" at the end of the cure period allows the creditor party to demand the cash equivalent of *any* balance showing three months after a demand notice is issued, regardless of whether that balance is more or less than the original deficit contained in the demand notice.

The contract does not define the meaning of the phrase "any remaining unequalized horsepower hours." In construing an undefined contractual term, Missouri courts have often considered the corresponding dictionary definition in an effort to accord the term its plain and ordinary meaning. *See, e.g., Burns v. Plaza West Assocs.,* 979 S.W.2d 540, 546 (Mo.Ct.App. 1998). Webster's Third New International Dictionary defines the term "remain" as "to be a part not destroyed, taken away, or used up . . . [to] be left when the rest is gone." Webster's Third New International Dictionary 1919 (1986). Accordingly, the contract's use of the word "remaining" compels the court to inquire " 'Remaining' with respect to, or from, what?" Because

the option to receive payment for horsepower hours is not triggered unless the owing party fails to equalize *the* deficit for which notice was issued, it is objectively reasonable to assume that the amount of payment to which the creditor party is entitled must be similarly correlated to the original deficit. Thus, according the term "remaining" its plain and ordinary meaning, and construing it in light of the overall contractual context, the court concludes that the term "any *remaining* unequalized horsepower hours" is more accurately read, at least from a purely objective perspective, as referring to the horsepower hours remaining, or left over, from the number of hours with which the owing party was charged to reduce, i.e., the number of hours for which the owing party was on notice to equalize.

The court's conclusion is bolstered by the fact that plaintiff's construction of the disputed language renders the term "remaining" superfluous, a result that is contrary to Missouri law. *See, e.g., Parker v. Pulitzer Pub. Co.,* 882 S.W.2d 245, 250 (Mo.Ct.App.1994) (courts faced with the task of interpreting contractual language are required to "construe each term of a contract to avoid an effect which renders other terms meaningless or illusory.") In the contract at issue here, although the phrase "any unequalized horsepower hours" appears twice within section 3.4, the word "remaining" is used only once. The first use of the phrase defines the creditor party's options at the end of the cure period, and the word "remaining" is inserted between "any" and "unequalized horsepower hours." The second usage of the term "any unequalized horsepower hours" appears later in section 3.4, and appears without the modifier "remaining." The second reference describes the parties' course of behavior in the event that the contract is terminated, such that, at the end of the contract, "settlement of *any unequalized horsepower hours* shall be paid for at the [agreed-to rate.]" The court concludes that, from an objective standpoint, according the terms "any re-

maining unequalized horsepower hours" and "any unequalized horsepower hours" identical interpretations would be not only inconsistent, but would render the word "remaining" meaningless, a result that is disfavored by Missouri courts.

■ Moreover, and perhaps more importantly, the doctrine of *contra proferentum*, as recognized by Missouri courts, warrants interpretation of the contract in favor of defendant. *See, e.g., City of Beverly Hills v. Village of Velda Village Hills,* 925 S.W.2d 474, 477 (Mo.Ct.App.1996). In Missouri, the *contra proferentum* doctrine allows the court to interpret an ambiguous term against the drafter of the contract. *Id.* ("The *contra proferentum* principle of contract construction . . . can only be applied to give meaning to an ambiguous term.") Thus, according to Missouri law, where

> there is no evidence of the parties' intent regarding the [disputed] ambiguous provision . . . another canon of construction comes into play. [In this case,] defendant undertook responsibility for drafting the agreement. "[I]f a contract is fairly open to two interpretations that construction must be adopted which is against him who prepared it and favor him who merely signed it." *John Deere Co. v. Hensley,* 527 S.W.2d 363, 365 (Mo. banc 1975). This canon, however, is employed only as a last resort when there is no evidence showing the parties' intent. *Berman v. Berman,* 701 S.W.2d 781, 788 (Mo.Ct.App.1985); *Rouggly v. Whitman,* 592 S.W.2d 516, 523 (Mo.Ct. App.1979). If defendant, [as draftsperson], is correct in his claim that there was no evidence as to intent, the plaintiff's construction prevails.

*Graham v. Goodman,* 850 S.W.2d 351, 355–56 (Mo. banc 1993). Applying the *contra proferentum* doctrine to the facts of this case, then, the ambiguity is to be resolved against plaintiff BNSF as the drafter of the contract under Missouri law.

■ The court notes that the "rule of construction requiring that ambiguous language be construed against the party responsible for its use is based more on a concept of appropriate allocation of blame for the faulty language than on an attempt to ascertain true intent or meaning." *Rouggly v. Whitman,* 592 S.W.2d 516, 523 (Mo.Ct.App.1979). Indeed, according to comment a to Restatement (Second) of Contracts § 206,

> Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party.

RESTATEMENT (SECOND) OF CONTRACTS § 206, cmt. a (1979). Thus, the court concludes that if BNSF had desired the contract to operate in the manner argued, it should have drafted the contract accordingly.

The court further notes that it finds irrelevant the fact that, rather than literally penning each and every word of the parties' agreement, plaintiff borrowed the disputed contract language from an AAR publication. Nothing in Missouri caselaw indicates that the *contra proferentum* principle applies only to agreements drafted in toto by the party who prepared the agreement; indeed, the drafter of the agreement is free to "lift" a contract's clauses from whatever source he or she chooses. *See, e.g., Village of Cairo v. Bodine Contracting Co.,* 685 S.W.2d 253, 264–65 (Mo.Ct.App.1985) (court construed ambiguity against respondent, holding that respondent, "although not the actual author of [the ambiguous contractual language], expressly approved and adopted the entire contract documents and tendered them as its own to the bidders, and executed them as its own.")

Thus, for all of the reasons set forth above, the court concludes that plaintiff is

entitled to the cash equivalent of 43,459,-275 horsepower hours, the number of hours for which the deficit notice was issued. Because the court has previously ruled that the applicable rate per horsepower hour to which plaintiff is entitled to payment for defendant's uncured balance is $0.0173, see Memorandum and Order dated March 2, 1999 at 26, the court awards plaintiff BNSF monetary damages in the amount of $751,845.46.

### B. Prejudgment Interest

■ The court turns next to the issue of prejudgment interest. The parties disagree as to whether Missouri or Kansas law determines the rate of prejudgment interest in this case. Specifically, plaintiff contends that Kansas law governs the issue, and thus that plaintiff is entitled to recover prejudgment interest at a rate of ten percent per annum. Defendant, on the other hand, maintains that Missouri law is decisive with regard to the issue of prejudgment interest, and thus that plaintiff is entitled to prejudgment interest at a rate of nine percent per annum.

■ A federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Accordingly, the court looks to Kansas choice of law rules to determine which state's law governs the issue of prejudgment interest in this case.

■ The court's research fails to reveal any Kansas authority resolving the issue as to what law governs the allowance of prejudgment interest as an element of damages for the breach of a contract where a conflict of laws is involved. Under Kansas choice of law rules, Kansas courts generally follow the First Restatement approach to resolving conflicts of law issues. *See Safeco Ins. Co. of America v. Allen*, 262 Kan. 811, 822, 941 P.2d 1365, 1372 (1997) (contracts actions); *Brown v. Kleen Kut Mfg. Co.*, 238 Kan. 642, 644, 714 P.2d 942, 944 (1986) (tort actions). Thus, the court looks to the First Restatement of Conflicts to determine whether Kansas or Missouri law governs the issue of prejudgment interest in this case.

Section 418 of the Restatement of Conflicts, entitled "Interest as Damages for Breach of Contract," provides that "[t]he rate of interest allowed as part of the damages for the breach of a contract is determined by the law of the place of performance." RESTATEMENT OF CONFLICT OF LAWS § 418 (1934). As specifically set forth in the parties' agreement, the contract at issue in this case relates to the operation and run-through of locomotive units through "the normal interchange point of Kansas City, Missouri." Although plaintiff claims that the contract was executed in the state of Kansas because the last signature of the agreement occurred there, plaintiff does not dispute that the contract was to be performed in Missouri. Thus, in light of the First Restatement of Conflicts' view that prejudgment interest is to be governed by the law of the state where the contract is to be performed, the court concludes that Missouri law applies to the issue of prejudgment interest under the facts of this case.[3]

---

**3.** The court notes that at least one court purporting to apply Kansas law has found persuasive the Second Restatement's approach to resolving the conflict of law issue with respect to prejudgment interest. *See Contract Lodging Corp. v. Union Pac. R.R.*, 1991 WL 278482 at *3 (D.Kan. Dec.19, 1991). Courts applying the Second Restatement approach generally hold that the issue of prejudgment interest is substantive, and thus that the law of the state under which the substantive legal issues were decided also "'determines whether plaintiff can recover interest, and, if so, the rate' at which it may be recovered. *Amoco Rocmount Co. v. Anschutz Corp.*, 7 F.3d 909, 920 (10th Cir.1993) (applying Wyoming's choice of law rules) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 207 cmt. e). Thus, even if this court were to conclude that Kansas courts would adopt the Second Restatement approach with respect to this issue, the outcome would be the same, and Missouri law would govern the award of prejudgment interest.

 Under Missouri law, prejudgment interest is awardable "at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made...." Mo.Rev.Stat. § 408.020 (1994). A court may award prejudgment interest only on liquidated claims. *J.R. Waymire Co. v. Antares Corp.*, 975 S.W.2d 243, 248 (Mo.Ct.App.1998). "A liquidated claim is one which is fixed and determined or readily ascertainable by computation or a recognized standard." *Id.* A claim becomes liquidated "so as to bear interest when the amount due is fixed by agreement between the parties." *Huffstutter v. Michigan Mut. Ins. Co.*, 778 S.W.2d 391, 394–95 (Mo.Ct.App.1989). Prejudgment interest is recoverable despite the existence of a dispute as to liability for the damages claimed as a result of the alleged breach. *Stillwell v. Universal Constr. Co.*, 922 S.W.2d 448, 458 (Mo.Ct.App.1996). Missouri courts have awarded prejudgment interest despite the parties' disagreement as to the precise amount of damages to which the claimant is entitled. *Unlimited Equip. Lines, Inc. v. Graphic Arts Centre, Inc.*, 889 S.W.2d 926, 942 (Mo.Ct. App.1994). Finally, a court may assess prejudgment interest even where it awards less damages than requested by the claimant. *Id.*

In this case, defendant was aware that plaintiff would be entitled to demand cash payment for any hours remaining uncured ninety days after the issuance of the November 5, 1997 notice of defendant's 43,-459,275 horsepower hour deficit. The monetary rate from which the cash equivalent of those hours was to be calculated was specifically fixed by the parties' contract, which provided that, in the event that a balance remained ninety days after a deficit notice was issued, the rate at which each horsepower hour would be charged was to be determined with respect to "the latest calendar year for which annual figures are available." Thus, the court concludes that the damages owed by defendant as of the date that plaintiff chose to exercise its option to demand cash payment for defendant's uncured deficit were readily ascertainable.

The court therefore concludes that plaintiff is entitled to prejudgment interest in this case. As set forth above, that plaintiff originally requested more damages than have been awarded by the court does not preclude an award of prejudgment interest. Similarly, defendant's assertion of a dispute regarding the appropriate rate at which plaintiff's damages were to be calculated, as well as its attempt to disavow its liability under the contract, have no effect on the court's conclusion. Accordingly, the court awards plaintiff prejudgment interest at the rate of nine percent per annum, accruing from February 1, 1998 forward.[4]

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff is entitled to judgment in the amount of $751,845.46.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiff is entitled to prejudgment interest at the rate of nine percent per annum, accruing from February 1, 1998 forward.

**4.** The court notes that is somewhat unclear whether plaintiff's cash demand was made on January 31, 1998 or February 1, 1998. In its brief regarding the issue of prejudgment interest, plaintiff requests prejudgment interest accruing from February 1, 1998 forward, and the court therefore enters its award accordingly.